

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-15-00012-CV

---

IN THE INTEREST OF K.D., A MINOR CHILD

---

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2014-70-DR

---

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

O P I N I O N

The Texas Department of Family and Protective Services (the Department) filed a petition seeking to terminate Mother's parental rights to her fourteen-year-old daughter, K.D. A trial court "may order termination of the parent-child relationship if the court finds by clear and convincing evidence[] (1) that the parent has . . . executed . . . an . . . irrevocable affidavit of relinquishment of parental rights" and "(2) that termination is in the best interest of the child." TEX. FAM. CODE ANN. § 161.001(1)(K), (2) (West 2014). As a result of a mediated settlement, Mother executed an irrevocable affidavit of voluntary relinquishment of her parental rights (the Affidavit) and agreed that termination of her parental rights was in K.D.'s best interest. The trial court entered judgment in accordance with the mediated settlement agreement (the MSA).

On appeal from the termination of her parental rights, Mother argues that both the MSA and the Affidavit were involuntarily executed because they were procured as a result of fraud. She also contends that the evidence is insufficient to support the trial court's finding that termination of her parental rights was in K.D.'s best interest. We find that the Affidavit was voluntarily executed and was not procured by fraud. We decline to consider whether fraud is a defense to a mediated settlement agreement under Section 153.0071 of the Texas Family Code, but because Mother would have to rely on the same facts we find insufficient to prove that the Affidavit was procured by fraud, we likewise find that the MSA is valid and enforceable between the parties. Finally, we conclude that the evidence is factually insufficient to support the trial court's finding that termination of Mother's parental rights was in K.D.'s best interest.

Accordingly, we affirm that part of the trial court's judgment finding that Mother's Affidavit is valid and enforceable against Mother. We reverse that portion of the trial court's

2

judgment finding that termination of Mother's parental rights was in K.D.'s best interest and remand the case to the trial court for a new hearing on whether termination is in K.D.'s best interest.

## I.    Factual and Procedural Background

### A.    Mother Entered Into a Mediated Settlement Agreement and an Affidavit of Relinquishment

The Department filed its petition on January 13, 2014. On that same day, Mother signed a document in which she voluntarily consented to the temporary removal of K.D. from the home. On September 22, 2014, K.D. started living with her aunt in Houston, Texas, and was placed in a larger school with better facilities.[1] From the beginning of K.D.'s placement, the Department's representatives told Mother that K.D. was happy in her placement, that her grades were excellent, and that she was participating in counseling with her school counselor. At a permanency hearing on November 5, 2014, the Department's representatives testified to the same information. They also added information that K.D. was making straight A's at school and that she was really enjoying her placement. They also testified that K.D. did not want to have face-to-face meetings with Mother. On December 30, 2014, Mother and the Department mediated this case before Bonnie Leggat Hagan. None of the prior information and testimony presented to Mother and the trial court about K.D.'s status was contradicted at the mediation. Based upon this information, Mother entered into the MSA. In the MSA, Mother agreed to the following terms:

> 1.    Mother . . . agrees to execute a voluntary relinquishment of parental rights, a copy of which is attached hereto and incorporated by reference. [Mother] further agrees that the Department of Children's and Protective Services [sic] shall present the affidavit of relinquishment be [sic] to the judge on the date set for the

---

[1]Mother testified that for approximately one year, she was only allowed one face-to-face visit with K.D.

3

trial of this case and request an order terminating the parental rights pursuant thereto.

2.      Mother agrees that termination of her parental rights is in the best interest of the child.

3.      Attorney for Mother and Mother agree to withdraw the case from the jury setting forthwith.

Mother also executed an irrevocable affidavit of voluntary relinquishment of her parental rights to K.D.—the Affidavit—in favor of the Department.  By signing the Affidavit, Mother made the following agreement:  **"This Affidavit of Relinquishment of Parental Rights is and shall be final, permanent, and irrevocable.  I fully understand that, if I change my mind at any time, I can never force the agency to destroy, revoke or return this affidavit."**  In the Affidavit, Mother (1) swore that she had been informed of and understood her parental rights and duties; (2) stated, "I understand that by naming the [Department] as managing conservator in this Affidavit of Relinquishment, I give up all my parental rights and grant them to the Department and/or to the adoptive parents with whom my child may be placed"; (3) agreed that "Termination of the parent-child relationship is in the best interest of the child"; (4) "freely, voluntarily, and permanently [gave] and relinquish[ed] to the Department all [her] parental rights and duties"; and (5) "consent[ed] to the placement of the child for adoption."  The Affidavit was incorporated into the MSA.  Upon conclusion of the mediation, Mother texted K.D. that she (Mother) was on dialysis and that if she died, she did not want K.D. to attend her funeral.

**B.      Mother Claims the Affidavit and the MSA Were Procured by Fraud**

Two days after the mediation was concluded, K.D. ran away from her placement home and visited Mother.  K.D. told Mother she suspected she (K.D.) was pregnant.  Mother also learned

that K.D. was associating with an alleged murder suspect, and she called K.D.'s caseworker to report that fact and to request that the caseworker perform a welfare check on K.D. Mother then contacted the school K.D. attended during her placement and learned that contrary to the information provided to her at court and at the mediation, K.D. had never met with the school counselor and was failing Spanish. Mother moved to set aside both the Affidavit and the MSA ten days after they were executed.

Understanding that the Affidavit could only be undone on grounds of fraud, duress, or coercion in its execution,[2] Mother alleged that she relied on the following fraudulent representations made by the Department in signing the Affidavit and relinquishing her rights to her child: that K.D. (1) was doing well in school and at home, (2) was in a safe and stable home, (3) was happy in her placement home, (4) wished to stay in her placement home, (5) desired infrequent visits by Mother, if any at all, (6) was receiving appropriate counseling, and (7) was living in conditions that were advantageous to her well-being. Because K.D. had run away from her placement home only a few days after the mediation, Mother argued that the Department's representations were fraudulent and were made with the purpose of inducing her to relinquish her parental rights. Mother relies on the same representations to support her claim that the MSA was also procured by fraud.

---

[2]Where "an affidavit of voluntary relinquishment was signed, notarized, witnessed, and executed in compliance with section 161.103 of the Family Code[, that] is prima facie evidence of its validity." *In re A.H.*, No. 09-14-00291-CV, 2014 WL 7183973, at *4 (Tex. App.—Beaumont Dec. 18, 2014, no pet.) (mem. op.) (citing *In re D.R.L.M.*, 84 S.W.3d 281, 296 (Tex. App.—Fort Worth 2002, pet. denied), *superseded by statute*, TEX. FAM. CODE ANN. § 263.405 (West 2014)). Thus, "[a] direct or collateral attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights or affidavit of waiver of interest in a child is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit." TEX. FAM. CODE ANN. § 161.211(c) (West 2014).

The trial court found that since K.D. had not run away until after the mediation, there was no evidence that the Department made any misrepresentations at the November hearing or during the mediation at which K.D. was present. The trial court did not find that the Department fraudulently induced Mother to enter into either the Affidavit or the MSA. The trial court did find that there was clear and convincing evidence that it was in K.D.'s best interest to terminate Mother's parental rights.

## II. Issues Presented

In her first two points of error, Mother asks, (1) "Was the affidavit of relinquishment of parental rights signed by [her] voluntarily executed?" and (2) "Was the [MSA] signed by [her] procured by fraud or deception?" In her third point of error, Mother challenges the legal and factual sufficiency of the evidence supporting the best-interest finding. As a basis for her first two points of error, Mother asserts that the Affidavit and the MSA are defective because they were executed as a result of fraud or deception. Essentially, we are called to decide two issues: (1) whether the Affidavit and the MSA are binding and enforceable against Mother and (2) whether Section 153.0071(e) foreclosed the trial court's review of whether termination of Mother's parental rights was in K.D.'s best interest?

## III. Whether the Affidavit and the MSA Are Binding and Enforceable Against Mother

### A. Standard of Review

Section 161.211(c) states, "A direct or collateral attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights or affidavit of waiver of interest in a child is limited to issues related to fraud . . . ." TEX. FAM. CODE ANN. § 161.211(c) (West. 2014). Once the Department demonstrated by clear and convincing evidence that Mother

executed the Affidavit pursuant to Section 161.103, the burden shifted to Mother to establish by a preponderance of the evidence that the Affidavit was executed as a result of fraud. *See In re R.B.*, 225 S.W.3d 798, 804 (Tex. App.—Fort Worth 2007, pet. denied).[3] Here, the "affidavit of voluntary relinquishment was signed, notarized, witnessed, and executed in compliance with section 161.103 of the Family Code [and, therefore,] is prima facie evidence of its validity." *A.H.*, 2014 WL 7183973, at *4 (citing *D.R.L.M.*, 84 S.W.3d at 296, *superseded by statute*, TEX. FAM. CODE ANN. § 263.405 (West 2014)). Thus, the burden shifted to Mother to prove by a preponderance of the evidence that the Affidavit was procured by fraud.

When a party with the burden of proving an issue attacks the legal sufficiency of the evidence supporting an adverse ruling on that issue, that party must show that the issue was established as a matter of law. *Duran v. Garcia*, 224 S.W.3d 309, 312 (Tex. App.—El Paso 2005, no pet.). "Stated differently, when attacking the legal sufficiency of the evidence to support an adverse finding on an issue for which it had the burden of proof, an appellant must demonstrate that the evidence conclusively established all vital facts in support of the issue." *Id.* (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)). This evaluation involves two parts. The court must first examine the record for evidence supporting the adverse finding while ignoring all contrary evidence; if no evidence supports the adverse finding, then the court must review the

---

[3]The court noted that a plurality of Justices on the Texas Supreme Court had written that "when an issue of involuntariness is raised, due process requires that the burden be on the proponent of the affidavit to establish, by clear and convincing evidence, that the affidavit was executed voluntarily." *R.B.*, 225 S.W.3d at 804 (citing *In re L.M.I.*, 119 S.W.3d 707, 715–16, 720, 739 (Tex. 2003) (Wainwright, J., concurring) (Owen, J., concurring in part and dissenting in part) (Hecht, J., dissenting)). It does not appear that a majority of the Supreme Court or any court of appeals has adopted this ruling. Moreover, in *Brown v. McLennan County Children's Protective Services*, 627 S.W.2d 390, 393, 394 (Tex. 1982), the Supreme Court held that it was the mother's burden to demonstrate that her affidavit of relinquishment under previous Section 15.02(1)(K) of the Family Code, now codified as Section 161.101(1)(K) of the Texas Family Code, "was obtained by fraud, misrepresentation, or overreaching." Thus, it appears that the burden of proving fraud still lies on the party opposing an affidavit of relinquishment.

7

record to determine if the contrary finding was established as a matter of law. *Id.* (citing *Sterner*, 767 S.W.2d at 690). While performing this review, the appellate court must indulge in every reasonable inference supporting the judgment, giving credit to favorable evidence if a reasonable fact-finder could do so and disregarding evidence to the contrary unless a reasonable fact-finder could not do so. *In re T.K.D.-H.*, 439 S.W.3d 473, 481–82 (Tex. App.—San Antonio 2014, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).

When a party with the burden of proof challenges the factual sufficiency of an adverse finding on that issue, that party must establish that the adverse finding is against the great weight and preponderance of the evidence. *Id.* at 482 (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam)). In performing this review, the appellate court "must consider and weigh all of the evidence," and the finding can be set aside "only if the evidence is so weak . . . that it is clearly wrong and unjust." *Id.* (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)).

### B. Mother Failed to Prove that the Affidavit Was Procured by Fraud

#### 1. Elements of Proof of Fraud

The elements of fraud are well established. A party attempting to prove fraud must establish that

> "(1) . . . a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury."

8

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)). An individual commits fraud recklessly when he does not possess sufficient information upon which to base a representation or does not know whether a statement he makes is true, but he makes the statement anyway. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 527 (Tex. 1998). In determining whether fraud existed in the execution of an affidavit of relinquishment, courts look to the circumstances surrounding its execution. *Vela v. Marywood*, 17 S.W.3d 750, 762 (Tex. App.—Austin 2000, pet. denied); *see also In re D.E.H.*, 301 S.W.3d 825, 828 (Tex. App.—Fort Worth 2009, pet. denied) (en banc).

### 2. Evidence Relating to Mother's Claim of Fraud

Mother's claim that she was misled by the Department is based, in part, on statements made during a November 5, 2014, permanency hearing concerning how K.D. had progressed since being placed with her aunt. At this hearing, the Department's caseworker, Whitney Williams, made several statements that formed the basis of Mother's allegations of fraud. Williams stated that K.D. was "doing very well in her current kinship placement with her aunt" and liked living there. Williams also informed the trial court that K.D. was making good grades, had a job as an office assistant, and had recently acquired a cell phone. Melissa Sampson, K.D.'s attorney ad litem, stated that she received the same positive reports from the aunt and that K.D. was "loving the placement there," was "making good progress," and was excited about exploring extracurricular activities offered by her new school.

K.D.'s aunt also testified at the hearing. She confirmed Williams' and Sampson's testimony by stating things were "going fantastic," that K.D. had given her no problems, that K.D.

was receiving medical care, and that K.D. was doing very well in school. The aunt informed the trial court that K.D. was not interested in meeting with Mother and that K.D. had recently chosen not to call Mother.

At a separate hearing on her motion to set aside the Affidavit and the MSA, Mother offered her own testimony in support of her allegation of fraud. Mother testified that the Department repeatedly represented during the November hearing and the December mediation that K.D. was happy in her placement with her aunt, had excellent grades, was in "intense therapy" with her school counselor, was otherwise doing well, and did not want to see or regularly communicate with Mother. Mother also testified that she signed the Affidavit and the MSA only because she relied on these statements.

Mother claimed that the Department's statements were false and misleading. Mother testified that on January 1, 2015, a few days after the mediation, K.D. ran away from her aunt's home, came to see Mother, and informed her that she might be pregnant. Mother contended that this occurrence established that K.D. did not want to live with her aunt and that her aunt was not an appropriate placement for K.D. She also testified that as a result of a conversation with K.D.'s school counselor, Mother learned that K.D. had never received school counseling and was failing her Spanish class. Mother told the trial court that the falsity of the Department's statements was not known to her until she spoke with K.D. after she had run away.

Williams admitted that K.D. had run away from her aunt's home and that she was approximately eight weeks pregnant. Williams had no personal knowledge of what K.D. had been doing since she ran away from her aunt's home. According to Williams, Mother said that K.D. had "popped in and out of her home" since she ran away. Williams had never spoken with the

school counselor and did not know how often K.D. met with her. Further, Williams had not received K.D.'s medical records and estimated that K.D. last saw a doctor "[m]aybe in November."

However, Williams also testified that the Department made no knowing misrepresentations to Mother. According to Williams, before the November hearing, K.D. said that she was not yet ready to be placed at home with her Mother and that she liked living with her aunt, even though she loved her Mother and was worried about her.[4] Williams further testified that prior to the November hearing, she spoke with Marcus Anderson, K.D.'s social worker at her school, who reported that K.D. was seeing a school counselor. Williams testified that to her knowledge, things were still going well on the day of the mediation. She told the trial court that she spent approximately five hours with K.D. during the mediation and that she observed nothing that led her to believe that the child wished for a different placement.

On one hand, Mother stated that K.D. was at the mediation and that no one indicated K.D. was unhappy or unwell or that any of the Department's previous statements might not be true. On the other hand, Mother claimed that she had discovered, before the November 5 hearing, that K.D. was unhappy, but had no proof of her unhappiness. The record demonstrated that Mother expressed her disbelief of the Department's statements during the November 5 hearing. Mother also believed, from a recent conversation with K.D., that she was currently happy and was supporting herself with "money of her own." Mother admitted that soon after the mediation was over, she texted K.D. and said that if she were to die, K.D. was not allowed to come to her funeral.

---

[4]Williams stated that K.D. was very concerned about her mother's health because Mother needed a kidney transplant and was on dialysis.

Mother knew that K.D. had previously run away from home after engaging in conflicts with Mother.

### 3. Analysis

We find that there is legally sufficient evidence to support the trial court's finding that the Department did not fraudulently induce Mother to enter into the Affidavit. We also find that the trial court's finding is not contrary to the great weight and preponderance of the evidence.

Although the events subsequent to Mother's execution of the Affidavit raise questions about the accuracy of the information provided to the trial court at the November 5, 2014, hearing,[5] Williams based her testimony on information specifically provided to her by K.D. and K.D.'s aunt during a home visit some five days prior to the hearing as well as information provided to her by K.D's social worker at her school, Anderson. Likewise, the statements Sampson made to Mother at that hearing were all based on information specifically provided to her by K.D. and her aunt. There is no evidence that K.D. and her aunt did not make those statements to Williams or Sampson. Thus, there is no evidence that Williams or Sampson knew the statements were false or that they knowingly misrepresented any information to Mother at the hearing. Nor is there evidence of any reckless misrepresentation. Neither Williams nor Sampson made representations concerning matters about which they had no knowledge; rather, their representations were based on the

---

[5]The fact that the Department provided the information upon which Mother bases her fraud claims under its statutory duty to keep the trial court informed of the child's status, *see* TEX. FAM. CODE ANN. § 263.306(a)(11) (West 2014) (providing that at permanency hearing, "the [trial] court shall . . . determine whether: . . . (B) the child's current placement is appropriate for meeting the child's needs"), does not prevent Mother from relying upon that information to establish fraud. The Supreme Court has held that a claimant may establish fraud by a public report or filing where "'[t]he maker of the misrepresentation [has] information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct.'" *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 218–19 (Tex. 2011) (quoting RESTATEMENT (SECOND) OF TORTS § 531 cmt. d (1977)). Clearly, the parent in a parental-rights termination case will be influenced by information provided to the court in that proceeding.

information they obtained directly from K.D. and her aunt. Finally, there is no evidence that K.D.'s aunt knowingly or recklessly misrepresented any information to Mother.

Here, before the execution of the Affidavit, nothing suggested that the statements made by the Department were false. The fact that K.D. ran away a few days after the mediation fails to establish that she was unhappy in her placement with her aunt or that she was otherwise unwell before or during the mediation. Moreover, even if K.D. was unhappy before or during the mediation, there is no proof that the Department knew about K.D.'s discontentment. Williams' testimony supported her belief that until the day K.D. ran away, K.D. was doing well in school, was being counseled, and was receiving medical care. It is entirely possible that K.D. ran away upon discovering that she was pregnant or after becoming emotionally upset by Mother's text message. As the trial court noted,

> The fact of the matter is we have no evidence before the Court that [K.D.] did not make some of these representations to Ms. Williams and Ms. Sampson. It could be that after the mediation she simply changed her mind. It could be that she became very upset with her mother's text to her on the date of the mediation, and that caused her to run away. It could be that she was trying to fool everybody with the Department, including Ms. Sampson. It could be a whole wealth of things that occurred, but there's not any evidence in this Court's opinion that there was any fraud on the part of Ms. Williams, Ms. Sampson, [K.D.'s aunt,] or anyone else.

> It may very well be that [Mother] relied on the information that was provided November the 5th when she made her decision to sign the affidavit and the mediated settlement agreement. But there's no evidence that those representations weren't accurate at the time they were made. The fact that the child ran away from the placement two days after the mediation doesn't make those statements false. It doesn't make them incorrect. I have no idea what's going on in the mind of that young lady as to why she ran away.

13

Simply put, there was no evidence the Department (1) knew that any statements made during the November hearing or the December mediation were false or (2) recklessly made any statement without knowledge of its veracity.

Mother also argues that the Affidavit was obtained via constructive fraud and that, therefore, she did not need to prove that any false statements were made with the requisite mental states. Constructive fraud "'encompasses those breaches that the law condemns as 'fraudulent' merely because they *tend* to deceive others, violate confidences, or cause injury to public interests, the actor's mental state being immaterial.'" *In re Estate of Kuykendall*, 206 S.W.3d 768, 770 (Tex. App.—Texarkana 2006, no pet.) (quoting *Chien v. Chen*, 759 S.W.2d 484, 495 (Tex. App.— Austin 1988, no writ)). Nevertheless, constructive fraud requires proof of a fiduciary or confidential relationship between the parties. *Id.* at 771. Neither the Department, nor its agents, nor the child's ad litem occupy a confidential or fiduciary relationship with a parent in a parental-rights termination case. While the Department may provide services to parents as part of a family service plan, the Department acts to secure the best interests of the child rather than the parent. *See generally* TEX. FAM. CODE ANN. § 262.001(B) (West 2014) ("In determining the reasonable efforts that are required to be made with respect to preventing or eliminating the need to remove a child from the child's home or to make it possible to return a child to the child's home, the child's health and safety is the paramount concern.").

Moreover, as we noted in *Kuykendall*, "the mere fact that one subjectively trusts another does not, alone, indicate that confidence is placed in another in the sense of a fiduciary duty. Some such relationship prior to and apart from the transaction at issue between the parties is required." *Kuykendall*, 206 S.W.3d at 771. Mother presented no evidence that any prior relationship apart

14

from the present case existed between herself and the Department, Williams, Sampson, or any other person or entity involved in procuring the Affidavit. Therefore, Mother's constructive fraud claim fails as well. Consequently, we find that the Affidavit was not procured by fraud and overrule Mother's first point of error.

### C. We Need Not Decide Whether Fraud is a Defense to the MSA Under Section 153.0071

As noted above, fraud is a defense to an affidavit of relinquishment. By contrast, whether fraud is a defense to a mediated settlement agreement is unresolved. Section 153.0071's language is identical to the language in Section 6.602 of the Texas Family Code which refers to mediation proceedings involving dissolution of marriage. *Compare* TEX. FAM. CODE ANN. § 153.0071(e) (West 2014), *with* TEX. FAM. CODE ANN. § 6.602(c) (West 2006). Under both sections, so long as a mediated settlement agreement meets statutory requirements, "a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." TEX. FAM. CODE ANN. § 6.602(c), § 153.0071(e). "The unilateral withdrawal of consent does not negate the enforceability of a mediated settlement agreement in a suit affecting the parent-child relationship." *In re L.M.M.*, 247 S.W.3d 809, 812 (Tex. App.—Dallas 2008, pet. denied) (citing *In re Circone*, 122 S.W.3d 403, 406–07 (Tex. App.—Texarkana 2003, no pet.)).

With respect to cases involving Section 6.602, Texas appellate courts, including this one, have concluded "that the statute does not require the enforcement of [a mediated settlement agreement] that is illegal in nature or procured by fraud, duress, coercion, or other dishonest means." *Milner v. Milner*, 361 S.W.3d 615, 619 (Tex. 2012) (citing *Morse v. Morse*, 349 S.W.3d 55, 56 (Tex. App.—El Paso 2010, no pet.); *Spiegel v. KLRU Endowment Fund*, 228 S.W.3d 237,

242 (Tex. App.—Austin 2007, pet. denied); *In re Marriage of Joyner*, 196 S.W.3d 883, 890 (Tex. App.—Texarkana 2006, pet. denied); *Boyd v. Boyd*, 67 S.W.3d 398, 403–05 (Tex. App.—Fort Worth 2002, no pet.); *In re Kasschau*, 11 S.W.3d 305, 312 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding)); *see In re Calderon*, 96 S.W.3d 711, 718 (Tex. App.—Tyler 2003, orig. proceeding). Inasmuch as the language in Section 153.0071 is identical to the language in Section 6.602, it would appear that fraud is a defense to a mediated settlement agreement under both statutes. Yet, the Supreme Court has specifically declined to resolve the issue under either statute. *See In re Lee*, 411 S.W.3d 445, 455 n.10 (Tex. 2013) (orig. proceeding) (stating "whether section 153.0071 mandates entry of judgment on a statutorily compliant [mediated settlement agreement] under any and all circumstances, even where, for example, the agreement '"was illegal or . . . was procured by fraud, duress, coercion, or other dishonest means"'" neither presented nor decided); *see also Milner*, 361 S.W.3d at 619 (stating that appeal of mediated settlement agreement entered under Section 6.602 of Texas Family Code (identical to Section 153.0071) "does not involve allegations of fraud or dishonesty, and so we leave the applicability of those defenses for another case").

Nevertheless, the Department sought termination in this case on the basis of the Affidavit. It matters not whether the Affidavit resulted from a court-ordered mediation and statutorily compliant mediated settlement agreement or whether it resulted from an informal conference of the parties and attorneys in the hallway of the courthouse. The primary issue is whether the Affidavit itself was procured by fraud. Because we find that the Affidavit was not a product of fraud, it does not matter whether the MSA was procured by fraud; the MSA merely requires her to execute a valid affidavit of relinquishment. Moreover, to prove fraud induced the MSA, Mother

16

would have to rely on the same facts which we have found insufficient to show that the Affidavit was induced by fraud. Therefore, we need not decide today whether fraud is a defense to a mediated settlement agreement. Accordingly, we hold that both the Affidavit and the MSA are valid and enforceable as between the parties.

**IV. Is There Legally and Factually Sufficient Evidence to Support the Trial Court's Finding that Termination of Mother's Parental Rights Was in K.D.'s Best Interest?**

**A. Does the Existence of the Affidavit by Itself Establish Sufficient Evidence that Termination Was in K.D.'s Best Interest?**

Initially, we note that there is caselaw holding that proof of an affidavit of relinquishment is sufficient evidence by itself to establish that termination of parental rights is in the child's best interest. *See In re Z.F.*, No. 07-14-00448-CV, 2015 WL 1814774, at *2 (Tex. App.—Amarillo Apr. 21, 2015, no pet.) (mem. op.); *In re C.E.*, No. 02-14-00054-CV, 2014 WL 3866159, at *4 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (per curiam) (mem. op.); *S.H. v. Tex. Dep't of Family & Protective Servs.*, No. 03-13-00151-CV, 2013 WL 3013874, at *3 (Tex. App.—Austin June 12, 2013, no pet.) (mem. op.); *In re A.G.C.*, 279 S.W.3d 441, 452–53 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Bunton v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-06-00329-CV, 2007 WL 1451757, at *4 (Tex. App.—Austin May 16, 2007, no pet.) (mem. op.); *Lumbis v. Tex. Dep't of Protective & Regulatory Servs.*, 65 S.W.3d 844, 851 n.1 (Tex. App.—Austin 2002, pet. denied). Texas courts have also held that a trial court does not err in failing to separately consider the *Holley* factors when presented with an affidavit of relinquishment. *A.G.C.*, 279 S.W.3d at 452 (citing *Ivy v. Edna Gladney Home*, 783 S.W.2d 829, 833 (Tex. App.—Fort Worth

17

1990, no writ)). Each of these cases rely on the Supreme Court's rulings in *Brown*, 627 S.W.2d at 394, and *Stubbs v. Stubbs*, 685 S.W.2d 643, 645–46 (Tex. 1985), for that holding.[6]

In *Brown*, the Supreme Court stated, "[W]e find it was the intent of the Legislature to make such an affidavit of relinquishment [of parental rights] sufficient evidence on which the trial court can make a finding that termination is in the best interest of the children." *Brown*, 627 S.W.2d at 394. The Supreme Court reiterated this in *Stubbs*, holding,

> We found that by enacting section 15.03(d) [now Section 161.103(c)], the legislature intended to make such irrevocable affidavits of relinquishment sufficient evidence on which the trial court could find termination to be in the children's best interests. No statement of facts was necessary unless it could be demonstrated that the irrevocable affidavit was obtained by fraud, misrepresentation or overreaching.

*Stubbs*, 685 S.W.2d at 645–46. Yet, neither *Brown* nor *Stubbs* addressed a sufficiency of the evidence issue on direct appeal of a parental-rights termination. Rather, in both cases, the appellants sought writ of error review in the court of appeals after the trial court's judgment had become final and the time for appeal had expired. And in both cases, the appellants argued that under Section 11.14(d) of the Texas Family Code (now Section 105.003(c))[7], the trial court's failure to produce a reporter's record of the original proceedings entitled them to relief on writ of error. *See id.* at 645 ("Ruth Stubbs contends that Texas Family Code section 11.14(d) required the court to make a record of the trial proceedings and that in this case the absence from the record of a statement of facts constitutes error on the face of the record."); *Brown*, 627 S.W.2d at 394 ("A

---

[6]It should be noted that in each of the cited cases, the courts identified evidence that termination of parental rights was in the child's best interest in addition to the affidavit of relinquishment and that notwithstanding their citation to *Brown*, none of them relied exclusively on the affidavit in finding sufficient evidence that termination was in the child's best interest.

[7]Section 105.003(c) provides, "A record shall be made as in civil cases generally unless waived by the parties with the consent of the court." TEX. FAM. CODE ANN. § 105.003(c) (West 2014).

record is required by Section 11.14(d) . . . . Brown claims that without a statement of facts the record is incomplete and therefore she was deprived of her right of appeal.").

In *Brown*, the Supreme Court concluded that the absence of a record did not entitle the appellant to relief because she had executed an affidavit of relinquishment of her parental rights, and in that affidavit, she waived a record of the proceedings; thus, the Supreme Court held, "[t]he affidavit and the agency's petition [were] the record which support[ed] the trial court's judgment." *Id.* Moreover, *Stubbs* did not involve an affidavit of relinquishment of parental rights at all. Rather, *Stubbs* involved an agreement incident to divorce, "provid[ing] for the division of marital property and for the conservatorship and support of the Stubbs' minor child." *Stubbs*, 685 S.W.2d at 644. The Supreme Court only mentioned *Brown* because "Dr. Stubbs cite[d] *Brown* . . . as authority for his argument that the waiver of citation and the agreement incident to divorce signed by Ruth Stubbs satisf[ied] the requirement of a complete record under section [105.003(c)]." *Id.* at 645. The Supreme Court distinguished *Stubbs* from *Brown* for that reason. Thus, neither *Brown* nor *Stubbs* holds that an affidavit of relinquishment establishes sufficient evidence by itself to withstand a legal and factual sufficiency review on direct appeal of a parental-rights termination case. Rather, *Brown* and *Stubbs* merely hold that an affidavit of relinquishment establishes sufficient evidence to satisfy Section 105.003(c)'s requirement that a record be produced in all cases under Title 5 of the Family Code such that the courts are not required to grant an application for writ of error due to the absence of a reporter's record.

Furthermore, to the extent *Brown* could possibly be read as holding that an affidavit of relinquishment alone is enough evidence to withstand a legal or factual sufficiency challenge on direct appeal of a termination of parental rights, it should be noted that *Brown* was issued

19

January 27, 1982, and rehearing was denied March 3, 1982. This is significant because on March 24, 1982, three weeks after rehearing was denied in *Brown*, the United States Supreme Court issued its opinion in *Santosky v. Kramer*, holding that under "the Due Process Clause of the Fourteenth Amendment[,] . . . [b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982). To hold that an affidavit of relinquishment alone satisfies that heightened burden of proof in parental-rights termination cases stretches *Brown* too far.

Accordingly, we agree with the San Antonio Court of Appeals that while the execution of an affidavit of relinquishment

> is relevant to the best interest inquiry[,] . . . such a relinquishment is not *ipso facto* evidence that termination is in the child's best interest. To hold otherwise would subsume the requirement of proving best interest by clear and convincing evidence into the requirement of proving an act or omission listed in section 161.001 by clear and convincing evidence. . . . [E]ven if a parent has voluntarily and irrevocably relinquished his or her parental rights under subsection (1), the State must still establish by clear and convincing evidence that termination of parental rights is in the child's best interest under subsection (2).

*In re A.H.*, 414 S.W.3d 802, 806 (Tex. App.—San Antonio 2013, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex. 1976)). We likewise agree with the Austin Court of Appeals that a trial court does not err in considering the best interests of a child in the face of an affidavit of voluntary relinquishment because "[t]here is no provision stating that the filing of an affidavit of voluntary relinquishment ends the trial court's

inquiry as to other bases for termination or regarding the best interest of the child." *Vallejo v. Tex. Dep't of Family & Protective Servs.*, 280 S.W.3d 917, 918 (Tex. App.—Austin 2009, no pet.).[8]

Consequently, proving the validity of the affidavit of relinquishment is merely one step towards termination of a party's parental rights. In a parental-rights termination case, the Department is also required to prove by clear and convincing evidence that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(2). In deciding whether termination is in the child's best interest under Section 161.001(2),

> courts may apply the non-exhaustive *Holley* factors to shape their analysis. These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest.

---

[8]The court of appeals in *Vallejo* also noted that public policy may justify denial of the Department's petition to terminate parental rights:

> Even when the affidavit is irrevocable, public policy does not favor allowing immediate termination if termination is not in the child's best interest. For instance, if termination would leave the child without financial support from a financially capable but disinterested parent, public policy would not favor letting the parent dispense with his obligation on the party's whim.

*Vallejo*, 280 S.W.3d at 921. This public policy justification for denial of a petition for termination on best interest grounds even if the parent has executed an affidavit of relinquishment is supported by Chapter 161. Section 161.205 contemplates that such denials might occur, stating, "If the court does not order termination of the parent-child relationship, the court shall: (1) deny the petition; or (2) render any order in the best interest of the child." TEX. FAM. CODE ANN. § 161.205 (West 2014); *see also Evans v. Tarrant Cnty. Child Welfare Unit*, 550 S.W.2d 144, 145 (Tex. App.—Fort Worth 1977, no writ) (holding that trial court did not err in refusing to dismiss Department's petition for termination and naming Department as managing conservator of minor children even though trial court denied Department's petition for termination).

*A.H.*, 414 S.W.3d at 806 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)).  In applying these factors, we must be ever mindful that "there is a strong presumption that keeping the child with a parent is in the child's best interest."  *Id*. (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)).

**B.  Does Section 153.0071(e) Foreclose a Best-Interest Review Under Section 161.001(2)?**

**1.  Introduction**

The Supreme Court has recently held that Section 153.0071(e) prohibits a trial court from denying "a motion to enter judgment on [a mediated settlement agreement] based on a best interest determination."  *Lee*, 411 S.W.3d at 447.[9]  The trial court in *Lee* rejected the parties' mediated settlement agreement under the general statutory best-interest standard of Section 153.002 of the Texas Family Code, and the Supreme Court reversed, holding that the specific provisions of Section 153.0071(e) of the Texas Family Code prevailed over the broad best-interest standard in Section 153.002.  *Id*. at 457–58.  Specifically, the Supreme Court held that "a trial court may not deny a motion to enter judgment on a properly executed [mediated settlement agreement] on [best interest] grounds."  *Id*. at 447.  Nevertheless, the Supreme Court did not address whether Section 153.0071(e) prevails over the specific best-interest standard in parental-rights termination cases brought by the Department, *see* TEX. FAM. CODE ANN. § 161.001(2), or whether the parties' agreement in a valid mediated settlement agreement that termination is in the child's best interest is binding on the trial court as well.

---

[9]Section 153.0071(e) states, "If a mediated settlement agreement meets the requirements of Subsection (d), a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law."  TEX. FAM. CODE ANN. § 153.0071(e).

However, Sections 153.002 and 161.001(2) both require the trial court to determine the best interest of the child, and *Lee* holds that a mediated settlement agreement obtained under Section 153.0071(e) forecloses the trial court's best-interest review under Section 153.002. Thus, we must decide whether Section 153.0071(e) also applies to the specific best-interest standard in Section 161.001(2). In other words, in this case, we must determine whether the trial court was bound by the parties' agreement that termination was in the best interest of K.D. For the following reasons, we find that the trial court was not so bound.

### 2. Distinctions Between the Best-Interest Standards of Sections 153.002 and 161.001(2)

To begin with, the best-interest issue in Section 153.002 is different from the best-interest issue in Section 161.001(2). Section 153.002 states that "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002 (West. 2014). By contrast, Section 161.001(2) states that "[t]he court may order termination of the parent-child relationship if the court finds by clear and convincing evidence: . . . (2) that termination is in the best interest of the child." Thus, while best interest is an element of the moving parties' proof regardless of whether the suit is brought under Chapter 153 or Chapter 161, different standards of review are applied to a trial court's best-interest finding under each chapter. *Compare In re J.F.C.*, 96 S.W.3d 256, 261, 263 (Tex. 2002) ("[T]here are two prerequisites for termination of parental rights under section 161.001. . . . The second prerequisite . . . is that termination must be in the child's best interests[,] . . . [and] [d]ue process requires the application of the clear and convincing evidence standard of proof . . . .") *with In re P.M.G.*, 405 S.W.3d 406, 410 (Tex. App.—Texarkana

23

2013, no pet.) ("[T]rial court's decision to modify conservatorship [should be reviewed] under an abuse of discretion standard," and "[u]nder this standard, legal and factual sufficiency are not independent grounds for asserting error, but are relevant factors in determining whether a trial court abused its discretion").

Moreover, Section 153.002 only applies to cases involving ongoing conservatorship and possession rights, neither of which are implicated in a parental-rights termination case. As the Supreme Court held in *Wiley v. Spratlan*,

> Involuntary termination of parental rights rests upon [Section 161.001 of the Texas Family Code]. . . .
>
> Suits for conservatorship, possession, and support are governed by Chapter [153] of the Family Code[,] and those matters are determined by the "best interest" test. Section [153.002]. Those proceedings are different and have different purposes from termination cases. Decrees under Chapter [153] may be modified or changed from time to time, but the parent still retains some rights in and control over a child. A termination decree, on the other hand, is complete, final, irrevocable. It divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. . . . The difference in the proceedings justifies the caution with which courts have characteristically considered termination cases.

*Wiley v. Spratlan*, 543 S.W.2d 349, 351–52 (Tex. 1976).[10]

---

[10]In its broadest sense, a parental-rights termination case could be said to involve conservatorship and possession because it seeks to terminate those rights. If so, then it would have been superfluous to include Section 162.001(2)'s best-interest requirement because Section 153.002's best-interest requirement would have already applied. "When the legislature passes two separate statutes on the same general subject matter, it is presumed to have done so for a particular purpose, and meaning must be given to both statutes." *Gaughan v. Nat'l Cutting Horse Assoc.*, 351 S.W.3d 408, 415 n.4 (Tex. App.—Fort Worth 2011, pet. denied). Thus, Section 153.002 must be interpreted as applying only to cases where conservatorship and possession rights continue, and Section 161.001(2) applies to cases where conservatorship and possession rights are terminated. *See also Richardson v. Green*, 677 S.W.2d 497, 500 (Tex. 1984) (rejecting appellant's argument that language in former statute eliminating Supreme Court's jurisdiction in "all cases of child custody, support or reciprocal support" included "actions to terminate parental rights").

24

### 3. The Constitutional Bases for Section 161.001(2)'s Best-Interest Requirement

In addition, the Department's burden of proving best interest in a parental-rights termination case is not only statutorily required, but constitutionally required as well. As the Supreme Court noted in *Holick*,

> The natural right existing between parents and their children is of constitutional dimensions. *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). Indeed, "involuntary termination of parental rights involves fundamental constitutional rights." *In re G.M.*, 596 S.W.2d at 846. This natural parental right has been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *See Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1976). A termination decree is complete, final, irrevocable and divests for all time that natural right as well as all legal rights, privileges, duties and powers with respect to each other except for the child's right to inherit. *Wiley*, 543 S.W.2d at 352; TEX. FAM. CODE ANN. § 15.07 (Vernon 1975). Moreover, the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 1391, 71 L.Ed.2d 599 (1980); *Richardson v. Green*, 677 S.W.2d 497, 500 (Tex. 1984). Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. *See Cawley v. Allums*, 518 S.W.2d 790, 792 (Tex. 1975); *Heard v. Bauman*, 443 S.W.2d 715, 719 (Tex. 1969).

*Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex. 1985). Likewise, parental-rights termination impacts not only the fundamental liberty interests of the parent, but also the fundamental liberty interests of the child on whose behalf the State's action is initiated.

> Cases like this do not present a bipolar struggle between the parents and the State over who has final authority to determine what is in a child's best interests. There is at a minimum a third individual, whose interests are implicated in every case to which the statute applies—the child.

*Troxel v. Granville*, 530 U.S. 57, 86, 89–90 (2000) (Stevens, J., dissenting); *see also In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003) ("Consideration of the private interest factor cannot be limited

to only the parent's interest. The child bears a substantial interest in the proceedings as well." (footnotes omitted)).[11]

Chapter 262 of the Family Code, which governs parental-rights termination cases brought by the Department, was enacted to provide the requisite due process in parental-rights termination cases. *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003) ("The Legislature has enacted a comprehensive statutory scheme to ensure that termination trials result in a correct decision.").[12] Section 161.001 provides the additional due process safeguard of requiring proof by clear and convincing evidence as required by *Santosky*. As the Texas Supreme Court has noted, although "due process considerations [do] not require us to set aside our procedural rules" and even though "[t]he State has an interest in the economical and efficient resolution of parental-rights termination cases[,] . . . [t]he State's interests in economy and efficiency pale in comparison to the private interests at stake, and to the risk that a parent may be erroneously deprived of his or her parental rights and the child may be erroneously deprived of the parent's companionship . . . ." *M.S.*, 115 S.W.3d at 546, 548. Chapter 262 provides protection against such erroneous deprivations through multiple layers of judicial oversight, and Section 161.001(2)'s best-interest review is a key part of that judicial oversight. *See T.W. v. Tex. Dep't of Family & Protective Servs.*, 431 S.W.3d 645, 651 (Tex. App.—El Paso 2014, no pet.) ("While it is presumed that it is in the child's best interest to

---

[11]The United States Supreme Court similarly observed in *Santosky* that "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Santosky*, 455 U.S. at 760. Likewise, the Supreme Court noted in *Stanley*, "We observe that the State registers no gain towards its declared goals when it separates children from the custody of fit parents." *Stanley*, 405 U.S. at 652. Accordingly, in a parental-rights termination case, the State's action impacts the fundamental liberty interests of both parent and child; just as a child should be removed from the "care, custody, and control" of an unfit parent, a child should remain secure in the "care, custody, and control" of a fit parent.

[12]No similar statutory framework exists for parental-rights termination cases brought by private litigants.

preserve the parent-child relationship, the requirement to show that termination is in the child's best interest in addition to the clear and convincing standard of proof subsumes reunification issues and guarantees the constitutionality of termination proceedings."). Although the statutory language in Section 153.0071(e) may indicate legislative intent to foreclose the trial court's broad exercise of discretion under Section 153.002's best-interest review to deny entry of a judgment consistent with a mediated settlement agreement, nothing indicates that the Legislature also intended to eliminate the Department's burden of proving, by clear and convincing evidence, that termination is in the child's best interest under Section 161.001(2) or the trial court's power to deny termination in the absence of such proof.

### 4. Balancing Section 153.0071(e) Against Constitutional Procedures in Parental-Rights Termination Cases

Of course, we do not hold that a settlement agreement obtained through mediation under Section 153.0071 accomplishes nothing in a parental-rights termination case brought by the Department. In this case, for example, the mediation resulted in the execution of a valid and enforceable affidavit of relinquishment and mediated settlement agreement. Consequently, the Affidavit eliminated the Department's burden of proving the first prong of Section 161.001,[13] and Mother cannot now back out of the Agreement, wherein Mother agreed that termination of her parental rights was in K.D.'s best interest, because it is enforceable against her. Thus, the Affidavit establishes the first prong of Section 161.001(1), and Mother has agreed that termination of her parental rights is in K.D.'s best interest as required by the second prong of Section 161.001(2). The question here is whether Mother's Agreement binds the trial court as well? In other words,

---

[13] A parent may still litigate the "issues relating to fraud, duress, or coercion in the execution of the affidavit." TEX. FAM. CODE ANN. § 161.211(c).

27

must the Department still prove by clear and convincing evidence that termination of Mother's parental rights is in K.D.'s best interest even though Mother agreed that it was, or do the Affidavit and the MSA eliminate that element of proof as well. After comparing the mediation process in a parental-rights termination case brought by the Department against the mediation process involving private parties and then evaluating the results of that comparison in light of constitutional due process considerations, it is clear that due process requires the State to still prove by clear and convincing evidence that termination is in the child's best interest. Stated differently, a mediated settlement agreement and an affidavit of relinquishment in a parental-rights termination case may be binding between the parties, but it does not eliminate the Department's burden of proving by clear and convincing evidence under Section 161.001(2) that termination is in the child's best interest or the trial court's power to deny termination in the absence of such proof.

In a typical contested child-custody case, such as in *Lee*, the goal of the litigation is to allocate conservatorship, possession, control, and access to the child between the biological parents. Mediation in such cases allows the parties to negotiate an agreement on future shared access to the child so that both parents can maintain a meaningful relationship with the child after the divorce becomes final without the conflict attendant to contested hearings. In such cases, the policy interests in reducing the child's exposure to conflict are advanced by structuring a future relationship between the child and both parents without the necessity of a contested hearing. Mediation in that instance simultaneously reduces conflict and secures the future parent-child relationship.

By contrast, in a parental-rights termination case, the goal of litigation is to protect the safety, health, and welfare of the child, and to accomplish that goal, the Department seeks to

28

completely sever the parent-child relationship forever. When the parties to a parental-rights termination case agree to submit the case to mediation under Section 153.0071 (or are ordered to attend), the parties exit the statutory framework designed to "ensure that termination trials result in a correct decision[,]" *B.L.D.*, 113 S.W.3d at 353, and enter into an informal setting with a mediator. The proceedings are generally confidential, and with limited exceptions, neither the mediator nor the parties can be forced to testify to communications made during the mediation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 154.073 (West. 2011).[14] If Section 153.0071(e) forecloses the trial court's best-interest review under Section 161.001(2), then instead of a judicial proceeding where the State bears the burden of proving best interest by clear and convincing evidence in a public tribunal, the parent and child would be left with an informal mediation procedure which is held in private, the contents of which are privileged from disclosure and not reviewable by any court.

Also, in a mediation involving private parties, the State's involvement is limited to the trial court's management of the litigation as an impartial tribunal. Thus, when the parties produce their mediated settlement agreement to the trial court, nothing remains for the trial court to do but enter judgment accordingly. But in a parental-rights termination case brought by the Department, the State is not acting only as an impartial tribunal, but also as the moving party in the litigation itself. As noted by the United States Supreme Court in *Santosky*, the State has a significant advantage over the parent in parental-rights termination cases:

> The State's ability to assemble its case almost inevitably dwarfs the parents' ability
> to mount a defense. No predetermined limits restrict the sums an agency may spend

---

[14]Indeed, in this case when Mother's counsel attempted to elicit testimony regarding information provided to her by the mediator, the Department objected that the information was privileged and confidential, and the trial court sustained the objection.

in prosecuting a given termination proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.

*Santosky*, 455 U.S. at 763. To hold that a mediated settlement agreement conclusively resolves the best-interest issue so that the Department no longer has to prove that element by clear and convincing evidence and that the trial court cannot deny termination in the absence of such proof would essentially eliminate the judicial oversight necessary to protect the fundamental liberty interests of both the parent and child from potential governmental overreach. The Department could, notwithstanding the disproportionate positions of the parties, seek an order compelling a party to mediation, and then, in a proceeding which is confidential and shielded from discovery, obtain the parent's agreement that termination is in the child's best interest, thereby foreclosing the trial court's ability to make an independent determination of that issue.

Yet, the guarantee of due process exists to prevent potential governmental overreach in cases involving fundamental liberty interests. *See Troxel*, 530 U.S. at 65 ("We have long recognized that the [Fourteenth] Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.' The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'"). Thus, the Texas Supreme Court has held that

in parental[-rights] termination cases, the parents' fundamental interest in maintaining custody and control of their children is balanced against the State's fundamental interest in protecting the welfare of the child. *See In re M.S.*, 115

30

S.W.3d 534, 547–48 (Tex. 2003). But for the State's fundamental interest in the welfare of the child, termination would not be proper. The Legislature has safeguarded the parent's fundamental interest by limiting the circumstances in which the State's interest can overcome the parent's interest. *See* TEX. FAM. CODE ANN. § 161.001. And we have further safeguarded the parent's interest by requiring courts of appeals to conduct an exacting review of the entire record when a parent challenges a termination order for insufficient evidence. *See C.H.*, 89 S.W.3d at 19. In short, the State's competing fundamental interest, the Legislature's statutory protection of the parent's fundamental interest by narrowing the grounds for termination, and our protection of the parent's fundamental interest by requiring an exacting review of the entire record together provide ample protection of the parent's fundamental interest.

*In re A.B.*, 437 S.W.3d 498, 505 (Tex. 2014). Consequently, to hold that an agreement to terminate the parent-child relationship obtained via a mediated settlement agreement eliminates the Department's requirement to prove by clear and convincing evidence that the agreement is in the child's best interest would eliminate the due process protection which makes termination of parental rights by the State constitutional. *See T.W.*, 431 S.W.3d at 651.[15]

---

[15]In *Troxel*, the United States Supreme Court held that "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68–69. Thus, the United States Supreme Court found that the trial court's order compelling the mother to provide additional visitation to the child's paternal grandparents violated the mother's fundamental liberty interest in the care, custody, and control of her children. *Id*. at 72–73. Yet, as noted above, the United States Supreme Court also held in *Troxel* that "the [Fourteenth] Amendment's Due Process Clause . . . includes a substantive component that 'provides heightened protection against governmental interference with certain fundamental rights and liberty interests.'" *Id*. at 65.

Accordingly, the State's authority to review a parent's decision with respect to her children varies significantly depending upon the nature of the State's involvement. If the State merely acts through its judicial power as an impartial tribunal presiding over a dispute between private parties concerning possession, access, visitation, and support of their child, the Constitution severely curtails the State's ability to review the parent's decision. By contrast, if the State acts through its executive power as the moving party in a suit seeking termination of a parent's parental rights, then the State—through its judicial power—has significant discretion to review the parent's decision in order to safeguard the parent's and child's fundamental liberty interests against potential overreach by the State—through its executive power. Thus, the Texas Supreme Court's decision in *Lee* is consistent with *Troxel* because it limits the ability of the State—through its judicial power—to review the parents' decision in a dispute between them over conservatorship, possession, and access to their child. But that same holding cannot be reached in a parental-rights termination case because due process requires the State—through its judicial power—to safeguard the parent's and child's fundamental liberty interests against potential overreach by the State—through its executive power.

**5. Section 153.0071(e) Can Be Interpreted Consistent With the Constitutional Safeguards in Parental-Rights Termination Cases**

Having determined that *Lee*'s interpretation of Section 153.0071(e) in the context of best-interest review under Section 153.002 does not apply to parental-rights termination cases brought by the Department, we must now interpret Section 153.0071(e) in the context of best-interest review under Section 161.001(2). Giving effect to the Legislature's intent is the primary objective in interpreting statutes. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). Unless a legislative definition is provided or is apparent from the context of the statute, we find legislative intent in the plain meaning of the statute, unless the plain meaning would lead to absurd results. *Id.* Moreover, we presume that the statutory language was selected with care and that the Legislature chose every word or phrase purposefully. *Id.* Finally, we presume that in enacting any statute, the Legislature intended to comply "with the constitutions of this state and the United States," and courts must give them a construction which is consistent with constitutional requirements. TEX. GOV'T CODE ANN. § 311.021 (West 2013); *Proctor v. Andrews*, 972 S.W.2d 729 (Tex. 1998). Therefore, we must determine whether Section 153.0071(e) can be interpreted in a manner which is consistent with the statutory language without violating the due process protections afforded parents in parental-rights termination cases. We find that it can.

Section 153.0071(c) states, "On the written agreement of the parties or on the court's own motion, the court may refer a suit affecting the parent-child relationship to mediation." TEX. FAM. CODE ANN. § 153.0071(c) (West 2014). By contrast, Section 153.0071(e) states, "If a mediated settlement agreement meets the requirements of Subsection (d), a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." TEX. FAM. CODE ANN. § 153.0071(e). Thus, Section 153.0071(c) identifies

32

those cases that may be submitted to mediation. From that subset of cases properly submitted to mediation and in which a mediated settlement agreement results, Section 153.0071(e), in turn, identifies those cases in which the trial court's duty to conduct a best-interest review is eliminated, indeed, in which the trial court's ability to conduct such a review is foreclosed.

Noticeably absent from subsection (e)—which is present in subsection (c)—is the language "suit affecting the parent-child relationship." Section 101.032 defines a "suit affecting the parent-child relationship" as "a suit filed as provided by this title in which the appointment of a managing conservator or a possessory conservator, access to or support of a child, or establishment or termination of the parent-child relationship is requested." TEX. FAM. CODE ANN. § 101.032(a) (West 2014). The phrase "this title" in Section 101.032(a) refers to Title 5 of the Family Code, and parental-rights termination cases are contained within Title 5. Therefore, any suit under Title 5, including parental-rights termination cases brought by the Department, can be referred to mediation under Section 153.0071(c), but not every suit referred to mediation under Title 5 produces a mediated settlement agreement that forecloses the trial court's best-interest review under Section 153.0071(e). The question then becomes which cases referred to mediation under Title 5 produce a mediated settlement agreement that forecloses the trial court's best-interest review under Section 153.0071(e).

Because Section 153.0071(e) is located within Chapter 153 and does not include the statutory language "suit affecting the parent child relationship" and because Chapter 153 only involves suits for conservatorship, possession, and access to children, then only cases for conservatorship, possession, and access to children that are referred to mediation under Section 153.0071(c) can produce a mediated settlement agreement that forecloses the trial court's best-

33

interest review. Because termination cases are governed by Chapter 161, Section 153.0071(e) would not apply to such cases. Therefore, Section 153.0071(c) and (e) can be interpreted to mean that any suit under Title 5, including a parental-rights termination suit, may be referred to mediation, but only those suits for conservatorship, possession, and access that produce a mediated settlement agreement can eliminate the trial court's best-interest review. If the Legislature had intended Section 153.0071(e) to apply to cases under Chapter 161, it could have written Section 153.0071(e) to read, "If a mediated settlement agreement [*in a suit affecting the parent-child relationship*] meets the requirements of Subsection (d). . . ." The absence of that language is evidence that the Legislature did not intend Section 153.0071(e) to apply to cases under Chapter 161. This interpretation is consistent with the statutory language and the required due process protections in parental-rights termination cases brought by the Department.[16]

Moreover, there is precedent for this statutory interpretation. In *Richardson*, the Supreme Court used similar reasoning in affirming its jurisdiction to review appellate court judgments in parental-rights termination cases under a prior statute. *Richardson*, 677 S.W.2d at 498. In that

---

[16]Further support for this interpretation can be found in Section 153.0071(f). Subsection (f) states that "[a] party may . . . file a written objection to the referral of a suit affecting the parent-child relationship to mediation on the basis of family violence." TEX. FAM. CODE ANN. § 153.0071(f) (West 2014). Subsection (f) modifies subsection (c), which determines which cases may be referred to mediation under Section 153.0071. If the Legislature intended the reference to "suits affecting the parent child relationship" in subsection (c) to apply to all of the remaining subsections of Section 153.0071, there would have been no need to repeat the phrase in subsection (f). The fact that the Legislature repeated the phrase in (c) and (f), but omitted it in (e) is evidence of the Legislature's intent that Section 153.0071(e) does not apply to parental-rights termination cases brought by the Department. Additionally, subsection (f) states, "This subsection does not apply to suits filed under Chapter 262." *Id.* This demonstrates that the Legislature found it necessary to specifically except parental-rights termination cases brought by the Department from subsection (f) because it included such cases in the subsection when it repeated the language "suits affecting the parent-child relationship." On the other hand, it did not need to include the exception in subsection (e) because (e) never included such cases to begin with. Consequently, by reading Section 153.0071(c)–(f) together, it is clear that the Legislature intended to permit all cases under Title 5 (including cases under Chapter 161) to be referred to mediation, but to permit only those cases under Chapter 153 that produce a mediated settlement agreement to foreclose the trial court's best-interest review.

case, the mother obtained a judgment terminating the parental rights of her ex-husband to their minor child. *Id*. The father appealed, and the court of appeals affirmed the judgment. *Id*. The Supreme Court granted the father's writ of error, and the mother challenged the Supreme Court's jurisdiction to hear the case "because the 1983 amendment of article 1821(3), TEX. REV. CIV. STAT. ANN., makes judgments of the courts of appeal final in all cases of child custody, support or reciprocal support." *Id*. at 499–500. According to the mother, because "actions to terminate parental rights are child custody cases," Article 1821(3) eliminated the Supreme Court's jurisdiction over such cases. *Id*. The Supreme Court held,

> Custody and termination actions are governed by separate chapters in Title 2 [now Title 5] of the Family Code. *See* TEX. FAM. CODE ANN. chs. 14, 15 (Vernon Supp. 1984) [now Chapters 153 and 161]. If the legislature had intended the 1983 amendment to encompass all actions under Title [5] of the Family Code, it would have stated: "all cases of divorce, or suits affecting the parent-child relationship" instead of limiting the exclusion of jurisdiction to "or child custody, support, or reciprocal support." We therefore hold that Article 1821(3) does not include involuntary termination of parental rights actions and that the Supreme Court of Texas continues to have jurisdiction to review court of appeals' judgments in such cases.

*Id.* at 500. Thus, as in this case, the Supreme Court found that the absence of the language "suits affecting the parent-child relationship" in the statute limiting judicial review indicated an intent by the Legislature that the limitation not apply to parental-rights termination cases.[17]

In the absence of any clear Legislative intent to the contrary, we find that Section 153.0071(e) does not foreclose judicial review of the best-interest element of proof in a parental-

---

[17]*See also Tex. State Bd. of Chiropractic Examiners v. Abbott*, 391 S.W.3d 343, 349, 350 (Tex. App.—Austin 2013, no pet.) (holding that where "statutes are not *in pari materia*, do not share a common purpose, and are not intended to be construed together, it follows that one provision could not be considered as controlling over the other or as creating an exception to it" and observing that "[t]he fact that the statutes could possibly cover the same person and the same property does not by itself warrant an *in pari materia* construction").

rights termination case brought by the Department.[18]  Likewise, we hold that Section 153.0071(e) does not foreclose an appellate court from reviewing the legal and factual sufficiency of a trial court's finding that termination is in the child's best interest.[19]  Therefore, we are not bound by the MSA and or the Affidavit to find that termination of Mother's parental rights was in K.D.'s best interest; instead, the Department was required to prove best interest by clear and convincing evidence.[20]

### D. The Evidence Is Legally but not Factually Sufficient to Support the Trial Court's Finding that Termination of Mother's Parental Rights Was in K.D.'s Best Interest

#### 1. Standards of Review

In *J.F.C.*, the Supreme Court established the standard of review applicable to claims of legal and factual insufficiency in parental-rights termination cases where clear and convincing evidence is required.  *J.F.C.*, 96 S.W.3d at 266–67.  Where an appellant claims the evidence is legally insufficient to support the verdict,

---

[18]We do not decide and express no opinion on whether Section 153.0071(e) would foreclose a trial court's best-interest determination in a parental-rights termination case resolved by a mediated settlement agreement in which the Department was not a party.

[19]In *In re Circone*, 122 S.W.3d 403 (Tex. App.—Texarkana 2003, no pet.), we held that Section 153.0071(c)–(e) prohibits a trial court from "go[ing] behind the signed agreement of the parties, which explicitly . . . stated in underlined capital letters the agreement was not subject to revocation" and "explicitly requires the court to enter judgment based on the mediation agreement."  *Id.* at 406, 407.  Accordingly, we held that the trial court correctly concluded that "a party cannot withdraw consent to a mediated settlement after the requirements of Tex. Fam. Code Ann. § 153.0071(d) (Vernon 2002) have been met."  *Id.* at 404, 407.  Yet, *Circone* was not a parental-rights termination case brought by the Department, but was a suit between the biological parents of the children for modification of possession and support.  *Id*. at 404.  Therefore, *Circone* is not inconsistent with our opinion today.

[20]Of course, this does not mean that the Department will be required to fully litigate every parental-rights termination case it files in order to establish best interest by clear and convincing evidence, even where it has obtained an affidavit of relinquishment and a mediated settlement agreement.  As in any case, the parties remain free to withdraw their jury demand, submit the matter to the trial court without a jury, and stipulate to evidence in order to establish the requisite proof.  Because few cases involving affidavits of relinquishment and mediated settlement agreements will become contested again immediately after the mediation has concluded, best interest can be established informally in the overwhelming majority of the cases resolved by a mediated settlement agreement and an affidavit of relinquishment.

a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then the court must conclude that the evidence is legally insufficient. Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence.

*Id*. at 266 (footnote omitted). When an appellant claims the evidence is factually insufficient,

a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. . . . [T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. A court of appeals should detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.

*Id*. at 266–67 (footnote omitted) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)).

There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome the presumption. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re K.S.*,

420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.). In deciding whether termination would be in the best interest of the child, the trial court may consider the nonexclusive *Holley* factors, which we previously set forth in this opinion. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *K.S.*, 420 S.W.3d at 855.

**1. The Evidence is Legally Sufficient to Justify Termination of Mother's Parental Rights to K.D.**

Because it determined that the Affidavit and the MSA were not procured by fraud, the trial court did not conduct the typical inquiry into whether termination of Mother's parental rights was in K.D.'s best interest. The trial court's judgment recites January 12, 2015, as the date of the final hearing. On that day, however, the trial court received Mother's motion to set aside both the Affidavit and the MSA and decided to continue the final hearing to address the merits of the motion. Because the Department relied on the Affidavit and the MSA to support termination of Mother's parental rights, the trial court limited the subject matter of the final hearing to Mother's allegations of fraud. Mother was prevented from testifying about matters that would aid our analysis of the *Holley* factors set forth above. Although the transcript of the November 5 hearing was admitted at the final hearing, that hearing focused on the appropriateness of K.D.'s placement with her aunt. We must determine whether the limited evidence before us is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights was in K.D.'s best interest.

As for the first factor, the desires of the child, Williams testified that she spoke with K.D. prior to the November 5 hearing and that K.D. stated that she loved Mother and worried about her, but "was not ready to be placed at home with her mother" at that time. Yet, the Department presented no evidence about K.D.'s wishes at the time of the final hearing. Mother testified that

during the mediation, Sampson and Williams indicated that K.D. wanted to live with her aunt, but K.D. ran away from the aunt's home prior to the final hearing. Mother attempted to testify that after running away from her aunt, the child expressed her desire to live with Mother, but was prevented from doing so when the trial court sustained the Department's hearsay objection. We find that the first *Holley* factor weighs against termination of Mother's parental rights. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

Next, K.D. was fourteen and had become pregnant since her removal from Mother. Thus, the emotional and physical needs of the child now and in the future are great. However, although K.D. ran away from both Mother and aunt, uncontested testimony established that K.D. had recently spoken to and visited with Mother. Also, the Department introduced no evidence suggesting that Mother had not provided or could not provide for K.D.'s emotional and physical needs or that Mother's actions were the cause of K.D.'s runaways, sexual activity, or association with an alleged murder suspect.[21] Other than Williams' testimony that K.D. had run away from Mother, there was no evidence about the stability of Mother's home. There was also no evidence regarding the programs available to Mother, whether Mother needed any assistance, or whether she was willing to take advantage of such programs. Accordingly, we find that the second, fifth, and seventh *Holley* factors weigh against termination of Mother's parental rights.

---

[21]Although the Department's pleadings speak to these matters, we have previously stated that "[p]leadings are not evidence." *In re E.W.*, No. 06-15-00018-CV, 2015 WL 3918292, at *7 (Tex. App.—Texarkana June 26, 2015, no pet. h.). Moreover, even had the trial court taken judicial notice of the file, which it did not in this case, it could not have taken "'judicial notice of the *truth* of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file.'" *Id.* (quoting *Kenny v. Portfolio Recovery Assocs., LLC*, No. 01-14-00058-CV, 2015 WL 1135410 (Tex. App.—Houston [1st Dist.] March 12, 2015, no pet.)).

The sixth *Holley* factor also weighs against termination of Mother's parental rights. Mother's plan was for the child to return home to her. The Department had no plan. At the time of the November 5 hearing, the Department represented that the aunt was the only placement they had for the child. Since being placed with the aunt, K.D. had become pregnant and had run away. At the time of the final hearing, the Department had failed to locate K.D. and did not state whether the aunt was still an appropriate placement for the child.

In spite of the limited record in this case, the Department presented evidence on several of the *Holley* factors. The record demonstrated the probability of emotional and physical danger to K.D.; she ran away from Mother's and aunt's homes, was sexually active, and had recently associated with a man "who was supposedly a murder suspect." Although Mother had spoken to K.D. recently outside of her home, she refused to divulge the exact location of her meeting with K.D. This thwarted the Department's efforts to locate the child in order to provide for her safety and ensure that she attended school, received counseling, and had appropriate medical care. Mother was aware of K.D.'s whereabouts two weeks before trial, but testified that she did not know where K.D. was at the time of the final hearing or whether she was in school. Yet, she knew that K.D. was supporting herself with "money of her own" and believed that she was happy. A fact-finder could have determined that Mother chose to allow the pregnant teenager to fend for herself or that Mother could not control K.D. Additionally, at the November 5 hearing, the aunt testified that K.D. did not want to meet with Mother or speak with her over the telephone because "her mom was going to intimidate her due to her words." At the final hearing, Mother admitted that soon after the mediation was over, she texted K.D. and said that if she were to die, K.D. was not allowed to come to her funeral. A reasonable fact-finder could have determined that such

40

evidence (1) indicated that Mother's lack of action could place the child in emotional and physical danger, (2) spoke directly to Mother's parental abilities, and (3) indicated that the existing parent-child relationship was not a proper one. Finally, as noted above, the fact that Mother executed the Affidavit is relevant to the best-interest determination as well. Accordingly, the third, fourth, and eighth *Holley* factors weigh in favor of termination of Mother's parental rights.

As to the ninth *Holley* factor, although Mother alleged that the Affidavit and the MSA were procured by fraud, we have rejected Mother's contention. Also, Mother offered no explanation for her failure to inform the Department of K.D.'s whereabouts to ensure the child's safety or her inappropriate text messages to her child. We find this factor weighs in favor of termination.

It is unnecessary to prove all of the *Holley* factors as a condition precedent to termination of parental rights. *C.H.*, 89 S.W.3d at 27. Considering the Affidavit and the MSA, we find that there is some evidence upon which a reasonable trier of fact could have formed a firm belief or conviction that it was in K.D.'s best interest to terminate Mother's parental rights. *See Brown*, 627 S.W.2d at 394. Therefore, we conclude that the evidence was legally sufficient to support the best-interest finding, and we overrule Mother's legal sufficiency point of error.

### 2. The Evidence Is Not Factually Sufficient to Justify Termination of Mother's Parental Rights to K.D.

With respect to factual sufficiency, however, the evidence is insufficient. Essentially, the Department's evidence establishes that there was conflict between K.D. and Mother and that Mother texted K.D. that if something happened to her, she did not want K.D. to attend her funeral. However, there is other evidence that K.D. loved her mother and was concerned about her health. There is also testimony that K.D. did not want to live with Mother, but when she ran away from her placement, she immediately contacted Mother. Also, there is evidence that K.D. ran away

41

from her placement home, was pregnant, and was associating with a murder suspect by the time of the final hearing, but those events happened after K.D. had been removed from Mother and placed with her aunt, not while she was in Mother's care. Moreover, although Mother had contact with K.D. before the final hearing, she testified that she did not know where K.D. was at the time of the final hearing or whether she was in school, Mother contacted the Department, told them about K.D.'s contact with an alleged murder suspect, and asked them to perform a welfare check on her. This was practically all Mother could legally do at that point in view of the trial court's orders in this case. *See* TEX. PENAL CODE ANN. § 25.03 (West Supp. 2014) ("A person commits an offense if the person takes or retains a child younger than 18 years of age: (1) when the person knows that the person's taking or retention violates the express terms of a judgment or order, including a temporary order, of a court disposing of the child's custody."). Finally, Mother voluntarily executed the Affidavit, and we have found that the Affidavit was not procured by fraud, but with respect to the best-interest determination, it is clear that the facts presented to Mother about K.D.'s condition—facts upon which Mother relied in deciding to execute the Affidavit— were not accurate.

As the record stands, the only thing proven is that there is conflict and dysfunction between Mother and K.D. But there are no facts establishing a danger to K.D.'s safety, health, or well-being while in Mother's custody. In short, there may be evidence that suggests K.D. "would be better off with a new family," but "the best interest standard does not permit termination merely because a child might be better off living elsewhere." *See In re W.C.*, 98 S.W.3d 753, 766 (Tex. App.—Fort Worth 2003, no pet.). Accordingly, we find that the evidence is factually insufficient

to support the trial court's finding that termination of Mother's parental rights is in K.D.'s best interest.

**V.      Remand to the Trial Court for a New Best-Interest Determination is Required**

We find that the Affidavit is valid and enforceable as between the parties, and we affirm that portion of the trial court's judgment. We also find that the evidence is factually insufficient to support the trial court's judgment that termination of Mother's parental rights is in K.D.'s best interest. Accordingly, we reverse that portion of the trial court's judgment. The question now raised is whether judgment should be rendered for Mother or whether the case should be remanded to the trial court for further proceedings.

Rule 43.3 of the Texas Rules of Appellate Procedure states that "[w]hen reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when: (a) remand is necessary for further proceedings; or (b) the interests of justice require a remand for another trial." TEX. R. APP. P. 43.3. In cases where, for any reason, a case has not been fully developed, remand is appropriate. *Knapp v. Wilson N. Jones Mem'l Hosp.*, 281 S.W.3d 163, 176 (Tex. App.—Dallas 2009, no pet.). As noted above, the final hearing in this case centered on whether the Affidavit and the MSA were induced by fraud, and the Department relied upon the confidentiality of the mediation process in objecting to evidence which would otherwise be relevant to the best-interest issue. Moreover, the trial court questioned the parties' counsel about its role in light of *Lee*. Accordingly, we find that the parties and the trial court did not have an opportunity to fully develop the record regarding the best-interest requirement under Section 161.001(2).

43

## VI.    Conclusion

Accordingly, we affirm that part of the trial court's judgment finding that Mother's Affidavit of Relinquishment is valid and enforceable as between the parties.  We reverse that portion of the trial court's judgment finding that termination of Mother's parental rights is in K.D.'s best interest and remand the case to the trial court for a new trial on whether termination is in K.D.'s best interest.


Ralph K. Burgess
Justice


Date Submitted:      June 3, 2015
Date Decided:        July 29, 2015