

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00072-CV

_____

IN THE INTEREST OF M.C. AND C.C., CHILDREN

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2013-1333-DR

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

## MEMORANDUM OPINION

Mother and Father divorced in 2013 and were appointed joint managing conservators of their three children, Karen, Maegan, and Clint.[1] In 2016, Mother petitioned the trial court to modify the parent-child relationship by denying Father's access to their children on the allegation of family violence. In August 2018, the trial court found the allegation of family violence true, but granted Father access to Maegan and Clint on modified terms.[2] On appeal, while Father raises no complaint about the terms of his access to Maegan, he argues that the trial court abused its discretion in denying his request for a standard possession order as to Clint. We find no abuse of discretion in the trial court's order and affirm the judgment.

## I.    Factual Background

Karen testified that Father lived in Midland, Texas, after the divorce and hosted parties during their visits with him. Karen informed the trial court that she, Maegan, and Clint would walk into Father's home at almost every visit to find beer cans on the coffee table, the trash can full of empty beer cans and boxes, and strangers partying. Karen testified that Father, who drank a lot of alcohol, had sex with other women, "almost g[o]t into fights" with others, and said "awful things" to her, Maegan, and Clint during their visits.[3]

Karen explained that she had to assume the parental role when visiting Father, that he did not have food in the house for them, and that she would have to call Mother to have pizza delivered.

---

[1]We use pseudonyms to protect the identity of the children. *See* TEX. R. APP. P. 9.8.

[2]Karen reached adulthood before August 2018 and was not a party to the trial court's order or this appeal; Maegan was sixteen years old, and Clint was eight years old.

[3]According to Karen, Father called Clint "the 'P' word and a loser and crybaby."

She recalled an occasion when she had "to split a package of ramen between the three of" them. Karen also stated Father inappropriately "grabbed [her] by the waist and put his hands almost to [her] bottom" while demanding that she kiss him despite her repeated refusals. She next testified about the incident of violence on July 8, 2016, that prompted Mother's petition to modify the parent-child relationship.

Karen testified that Father left her, Meagan, and Clint without informing them of when he would return. Thirty minutes after his absence, Karen texted Father and told him she was leaving if he did not return in an hour. According to Karen, Father returned twenty minutes later and called her "the 'B' word," which prompted Karen to walk to the room she shared with Maegan and Clint to call Mother. Karen testified that Father came into the room occupied by all the children and strangled Maegan. She said,

> [Father] just grabbed [Maegan] by the neck in, like, a chokehold and he pulled her off the bed and holds her there for a second. And I see [Maegan's] face get red and see her banging on his arm telling him to let go and then I notice her face getting red and she started to get really red and I could tell that she was struggling. And then he drug her across the hallway . . . dropped her inside of his bedroom and then shut the door behind him.

When she tried to intervene, Karen testified Father grabbed her arm and asked if she "want[ed] to be next." Karen pushed Father off her, called Mother again to report what happened, packed, and drove away with Maegan and Clint to their aunt's home. According to Mother, Clint saw the choking incident and was "bawling and scared shaking" when they arrived at their aunt's home. Fifteen minutes later, the children "headed straight to the police station" to report the incident. A photograph of Maegan's red neck taken on that day was admitted into evidence. Mother testified that it was in Clint's best interests for any visits with Father to be supervised.

3

Father testified that, although he consumed alcohol, it did not impair his judgment when he was around the children. He added that he was "just playing around, wrestling" when he grabbed Maegan, that it was possible that he had grabbed her too tight, but could not otherwise explain the red marks on Maegan's neck. Father acknowledged Karen's concern about his "[d]rinking problem," and "[a]nger problem," but did not believe he currently had those problems. Father's fiancé testified that she had been around Father and his children three or four times and believed Father's relationship with them was good. Father's fiancé testified she was at Father's home when the alleged choking incident occurred and did not witness Father assault Maegan.[4] She testified that Karen and Maegan wanted to leave, but that Clint wanted to stay.

Clara Hunter, a licensed professional counselor at the Women's Center of East Texas, testified that she counselled both Karen and Maegan, who both exhibited signs of post-traumatic stress disorder after the choking incident. That said, Hunter testified that she also visited with Clint, who wanted to see Father. Robert Neibert testified that he assisted the trial court by supervising visits between Father and Clint and characterized those visits positively.

Father informed the trial court that he worked fourteen days in a row, followed by seven days off, and wished to see Clint during those seven days. Father understood that Clint might be uncomfortable with initial visits, and testified he was agreeable to a "step up situation" comprised of four-hour unsupervised visits on the Saturdays he was available, followed by eight hours unsupervised on available Saturdays in August and September 2018, and then overnight Saturday visits in October through November. Father testified that he ultimately wished for a standard possession order and that his proposed arrangement would be in Clint's best interests.

---

[4]Father's fiancé first testified she was there on July 21, which was not the same day as the choking incident.

4

In its August order, the trial court awarded Father the following possession of Clint:

a.      Between the date of the entry of this order and October 31, 2018—On each of [Father]'s weekends home for up to 4 hours to be supervised by Robert Neibert. [Father] must exercise at least ¾ of these visits to move to the next step.

b.      From November 1, 2018 to February 28, 2019—On each of [Father]'s weekends home from 11:00 a.m. to 3:00 p.m. on Saturday to be supervised by [Father's] fiancé. . . . [Father] must exercise at least ¾ of these visits to move to the next step.

c.      Beginning March 1, 2019—On each of [Father]'s weekends home from 10:00 a.m. to 6:00 p.m. on Saturday.

After a motion for new trial, the trial court modified its order to include possession of Clint "[b]eginning in May 2019 . . . on each weekend home on Saturday from 10:00 a.m. to 6:00 p.m., and the following Sunday from 1:30 p.m. to 6:00 p.m." The trial court also made provisions for holidays.

## II.      Standard of Review

"Section 153.002 states that '[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.'" *In re D.W.G.K.*, 558 S.W.3d 671, 687 (Tex. App.—Texarkana 2018, pet. denied) (quoting TEX. FAM. CODE ANN. § 153.002 (West 2014)). "Trial courts have wide discretion in determining what is in the children's best interests." *In re Marriage of Ivers*, No. 06-03-00155-CV, 2004 WL 911320, at *3 (Tex. App.—Texarkana Apr. 21, 2004, no pet.) (mem. op.); *see In re P.M.G.*, 405 S.W.3d 406, 410 (Tex. App.—Texarkana 2013, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). "This is because the trial court is in the best position to observe the demeanor and personalities of the witnesses and can feel forces, powers, and

influences that cannot be discerned by merely reading the record." *Marriage of Ivers*, 2004 WL 911320, at *3.

"A trial court abuses its discretion only when it has acted in an unreasonable or arbitrary manner, or when it acts without reference to any guiding principle." *P.M.G.*, 405 S.W.3d at 410 (quoting *In re Marriage of Jeffries*, 144 S.W.3d 636 (Tex. App.—Texarkana 2004, no pet.)). "Under this standard, legal and factual sufficiency are not independent grounds for asserting error, but are relevant factors in determining whether the trial court abused its discretion." *Id.* "In determining whether the trial court abused its discretion, we consider whether the trial court had sufficient evidence upon which to exercise its discretion and, if so, whether it erred in the exercise of that discretion." *Id.* "We consider only the evidence most favorable to the trial court's ruling and will uphold its judgment on any legal theory supported by the evidence." *Id.* "Where, as here, no findings of fact and conclusions of law are filed, it is 'implied that the trial court made all the findings necessary to support its judgment.'" *Id.* (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

## III. The Trial Court Did Not Abuse Its Discretion in Denying Father's Request for a Standard Order of Possession of Clint

"The guidelines established in the standard possession order are intended to guide the courts in ordering the terms and conditions for possession of a child." TEX. FAM. CODE ANN. § 153.251 (West 2014). In support of his argument that the trial court abused its discretion in failing to award a standard order of possession of Clint, Father cites Section 153.252 of the Texas Family Code, which establishes a "rebuttable presumption that the standard possession order . . . (1) provides reasonable minimum possession of a child for a parent named as a possessory

6

conservator or joint managing conservator; and (2) is in the best interest of the child." TEX. FAM. CODE ANN. § 153.252 (West 2014).

That said, the Texas Family Code also allows the trial court to consider the following when ordering the terms of possession of a child: "(1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor." TEX. FAM. CODE ANN. § 153.256 (West Supp. 2018). The commission of family violence is a relevant factor. *See* TEX. FAM. CODE ANN. § 153.004(c) (West 2014); *see In re N.P.M.*, 509 S.W.3d 560, 565 (Tex. App.—El Paso 2016, no pet.).

The presumption in Section 153.252 is rebuttable. In fashioning Father's possession order, the trial court accounted for Karen's testimony about Father's behavior, Father's work schedule and requested proposed possession order, Clint's age and best interests, and its finding that Father had committed family violence against Maegan in front of Clint.

Father makes no challenge to the trial court's finding of family violence on appeal. Rather, the argument portion of his brief states,

> The father's employment has produced high wages and substantial child support and an irregular life schedule. And teenage "angst" has produced an untenable relationship between father and daughter. But the father/son relationship is a nascent being. Frequent, unstructured "dad" time cannot be injurious to a son. A simple, standard possession order needing only a calender [sic] to schedule would cut down on uncertainty during the fleeting impressionable years to come in [Clint]'s life. To deny such predictability is an abuse of discretion.

We agree that it is important for a parent to spend time with and raise his child. Indeed, "the right of a parent to maintain custody of and raise his or her child 'is an interest far more precious than any property right.'" *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003) (quoting *Santosky*

7

*v. Kramer*, 455 U.S. 745, 766–67 (1982)). A parent's interest "in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68–69.

Even so, an unfit parent risks losing unfettered custody and control of his child. *See In re K.D.*, 471 S.W.3d 147, 167 n.11 (Tex. App.—Texarkana 2015, no pet.). "[I]n a custody dispute between the biological parents, the State acts in only one capacity—as a neutral arbiter acting through its judicial power to resolve the custody question based on what is deemed by it to be in the child's best interest." *D.W.G.K.*, 558 S.W.3d at 688. Because "in a custody case between the biological parents, the State's concern for the best interests of the child is paramount," "a trial court is permitted to place conditions on a parent's access, such as supervised visitation, if necessary for the child's best interest." *Id.* at 688–89; *In re P.A.C.*, 498 S.W.3d 210, 216 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Given the unchallenged finding of family violence on appeal and the facts of this case, we conclude that the trial court did not abuse its discretion in deviating from the standard possession order.

**IV.  Conclusion**

We affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:  April 18, 2019
Date Decided:  May 6, 2019