In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00319-CV**
_____

**IN THE INTEREST OF K.L.G.S., K.B., AND K.B.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 17-05-06637-CV**

**MEMORANDUM OPINION**

Following a bench trial, the trial court terminated Mother's parental rights to her minor children, K.L.G.S. ("Kyle") age 8, K.B. ("Keith") age 5, and K.B. ("Kate") age 3, based on Texas Family Code subsections 161.001(b)(1)(D), (E), (N), (O) and a finding that termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (2).[1,2] The trial court also terminated

---

[1] To preserve the parties' privacy, we refer to them and their family members by pseudonyms or their familial relationship. *See* Tex. Fam. Code Ann. 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2] Mother has a fourth minor child. Her parental rights to this child were not considered in the trial court and likewise are not considered in this appeal.

Father's parental rights to Keith and Kate, the two minor children he shared with Mother, based on Family Code subsection 161.001(b)(1)(K) and the trial court's best interest finding. *See id.* § 161.001(b)(1)(K), (2). Mother and Father appeal the trial court's Order.[3]

On appeal, Mother complains the evidence was legally or factually insufficient to support the trial court's findings of condition endangerment; conduct endangerment; constructive abandonment; and failure to comply with her court-ordered service plan. *See id.* § 161.001(b)(1)(D), (E), (N), and (O). She further argues that the trial court erred in finding that termination of her parental rights was in the children's best interest and in appointing the Department of Family and Protective Services ("the Department") as the children's permanent managing conservator. *See id.* § 161.001(b)(2).

Father contends on appeal that his signed affidavit relinquishing his parental rights was invalid, in that it did not comply with the requirements set forth in the Family Code and allegedly was procured fraudulently. *See id.* §§ 161.001(b)(1)(K), 161.103(b). In addition, Father contends the trial court erred in finding that termination was in his children's best interest. *See id.* § 161.001(b)(2).

We affirm the trial court's Order of Termination as to both Mother and Father.

---

[3] Kyle's biological father died more than five years before trial.

## I. BACKGROUND

On March 14, 2023, the Department filed two separate petitions to terminate Mother's and Father's parental rights to their children. The trial court later consolidated these cases. The Department supported its petitions with the affidavit of its investigator, Tavaughna Holder ("Holder"). Holder's affidavit set out the information leading to the children's removal from the home.

According to Holder's affidavit, the Department received an initial referral in January 2023, alleging Mother's neglectful supervision of Kyle who often missed school because his parents were arguing. When Mother and Father argued, Mother did not want to take Kyle to school, and he did not want to go to school due to his fear that "something [would] happen to his mom." Father reported that Mother believed that the walls were talking to her, and Mother would wake the family by "screaming at the walls." There was also a report that Mother was violent toward Father.

Holder stated she was concerned for the children's safety due to Mother's apparent mental health issue. Father told Holder that Mother did not have a mental health disorder, but instead, had a grand mal seizure months earlier when she fell and hit her head. Father told Holder that Mother's symptoms worsened after that event. Father confirmed to Holder that Mother had a prior suicide attempt, but he denied a need to place the children in daycare to enable Mother to address her mental

health needs while Father was at work. On February 17, 2023, both Mother and Father agreed and signed a Safety Supervision Plan that required them to put the children in day care and not leave them alone with Mother.

When Holder met with Mother and Father, Mother stated that she had been diagnosed with manic-depressive disorder, but that Father disposed of her medication because she "d[id] not have any mental health issues and she d[id] not need any medication." Mother later agreed to seek mental health treatment, but Father prevented it because the facility "tried to kill her[.]" In mid-March 2023, Mother advised Holder that "she had been raped and put in a mental hospital because of [Father] and he is using technology to make her look crazy so he can get custody."

Holder's Affidavit stated that, while the case was pending, Father was arrested for assaulting Mother. She stated Mother did not want Father to return to her home when he was released from jail and that she agreed to place her children in day care so that she would not be left alone with them and be able to seek mental health treatment. In spite of the agreed Safety Supervision Plan, signed in February, Mother did not place the children in day care or obtain mental health treatment.

Another person Holder interviewed confirmed that Mother and Father have a history of continued drug use. This individual advised Holder that despite Father's claims, Father did not have a job, and he also reported Mother's suicide attempt and recent manic behavior.

4

Holder's affidavit includes a summary of the family's history with the Department. This summary includes allegations of domestic violence and drug use. Holder was concerned about the children's safety due to violence, drug use, and Mother's mental health, which "appear[ed] to be declining daily due to her not being on her recommended medication[.]" Holder also stated that Mother's "behavior appears to be getting more erratic and she appears paranoid." The Department therefore requested to be named as the children's temporary managing conservator.

## II. TRIAL EVIDENCE

### A. Mother

Mother was represented by counsel at the trial. Mother's attorney confirmed that Mother was aware of the trial setting; however, Mother did not attend the trial.

### B. Holder's Testimony

Holder testified that she is an investigator with the Department. She is familiar with Kyle, Keith, and Kate, since she removed them from the home in 2023. According to Holder, Mother is the mother of all three children, and Father is the father of the two younger children, Keith and Kate; Kyle's biological father died before trial.

When the children were removed, the Department was investigating allegations that Mother neglectfully supervised the children due to her mental health issues. Holder began her investigation by speaking with Kyle at school. She

5

continued her investigation by speaking with the person who reported the neglect and with Mother and Father.

When Holder first visited Mother's house, in February 2023, nobody answered her knock, although Holder could hear people inside. Holder therefore telephoned Father, who told Holder that he and Mother had been in a relationship for "about five years[,]" and that, although Mother did have mental health issues, her issues were caused by seizures, and Mother was seeing a doctor for treatment. Father also mentioned Mother's suicide attempt but indicated that Mother's seizures "were the cause of, like, her – all of that. And that it was being cared for." Father and Holder arranged to meet the following day, but he tried to cancel the meeting and advised Holder that Mother did not want to meet or deal with the Department.

The next day, Holder returned to the house and met with Mother and Father. During that visit, Mother confirmed her November 2022 suicide attempt and recalled that she was taken to Tri-County Behavioral Healthcare before being taken to Woodland Springs, "where she spent some time and was put on medication." When Mother returned home after her hospitalization, Father "threw her medication out[]" because he did not want her to take it due to his belief that Mother "did not need the medication and that she had no mental health concerns and that he had no concerns for her caring for the children." In response, Mother told Father that she did have mental health concerns, needed her medication, and wanted to get help. Holder

spoke with Father about the importance of mental health, and "he agreed to allow" Mother to get help. Father also agreed not to leave Mother alone with the children until the Department could get the children into daycare and get Mother a mental health assessment. Holder followed up with Mother "several times" about the mental health assessment, but Father called Holder, telling her to stop contacting Mother because Mother "was not going to be going in for a mental health assessment because he didn't feel that she needed it and that they were not going to be doing the daycare." Mother never received a mental health assessment.

During the pendency of this case, Father became "stressed out" according to Mother's characterization of the situation and assaulted her. Father was arrested for this assault, and Mother did not want him returning to the house they previously shared. After Father was released from jail, Mother and Father called Holder; Father wanted to know "what was going on with the case so that he can know how to follow through[,]" and Mother reported that Father and his friends were harassing her and requested that Holder pick up the children because she "just could not deal" with the threats and harassment. Holder testified that, during that call, Mother seemed to be "kind of talking in circles and just seemed more paranoid. She was not able to, like, speak a sentence from beginning to end or to, like, explain to me, like, exactly who was harassing her and exactly where her fear was coming from." Holder recalled that she could not tell whether Mother's lack of focus was due to mental health issues

or drug use, but noted that regardless of the cause, the Department was concerned for the children's safety, and therefore was already in the process of seeking the children's removal.

## C. Amber Evans's Testimony

Amber Evans ("Evans") testified that she is a Department case worker. Until shortly before trial, Evans was the case worker assigned to this case. Evans described the service plan she developed for Mother and Father. According to Evans, Mother's service plan required her to complete a psychological evaluation and follow any recommendations of the psychologist, attend parenting classes, obtain stable housing and employment, and obtain an alcohol and drug assessment. Although Mother completed a psychological evaluation, she did not complete any other required services or follow up with the recommended psychiatric evaluation, and did not submit to the random drug testing. In addition, Mother did not visit her children during the case. When asked about safe and stable housing, Evans acknowledged that although she had not been inside Mother's home, she had seen the outside of the property "probably four or five times throughout the duration of the case." She described Mother's property as "a dilapidated compound of houses[.]"

When asked whether the Department made any accommodations for Mother due to Mother's mental health disabilities, Evans testified that "it was never brought up to me that she would need extra help getting things done. She did not demonstrate

to me that that was something that she needed, and she never asked that that was given." Evans's biggest concern was that Mother would contact her after a period of no contact and ask to speak to her caseworker, who was Evans. Mother would then tell Evans that they had never met and state that Evans had not given her the service plan although she had done so. Evans consequently began contacting Mother's attorneys, rather than Mother, herself, so that there would be no misunderstanding about what services the Department was providing to Mother.

As of the time of trial, Kyle was living in a foster home, and Keith and Kate were living with their paternal grandmother ("Grandmother"). In Evans's opinion, Keith and Kate were "doing well" in Grandmother's home, and it was in their best interest to remain there. She described the home as "very nice[,] very appropriate[,] clean[,]" and presenting no concerns for the children's safety or welfare. It was the Department's goal to keep Keith and Kate with Grandmother, who planned to adopt them. Kyle's foster family, with whom he had lived since removal, planned to adopt him.

**D. Mary Levesque's Testimony**

Mary Levesque ("Levesque") testified that she is the child advocate appointed for Keith and Kate. She agreed with the Department's goals and believed that termination was in the children's best interest. She also agreed with Evans that

Grandmother's home was clean, safe, and appropriate for Keith and Kate, who were "doing great there." She called Grandmother "a very good caretaker."

When Levesque spoke with Mother about working on her service plan, Mother responded that no one from the Department had contacted her and she did not know her case worker. Levesque sent Mother text messages with Evans's name and contact information but did not believe that Mother contacted Evans. Mother never told Levesque about any services she had completed, despite Levesque telling Mother to work on her service plan.

Levesque also related an incident when she called Mother to remind her about a scheduled court appearance. After Mother failed to appear, Levesque contacted Mother and she told Levesque that "she wanted to come, but she went to leave the house and someone had put nails in her driveway, so she was not able to back up the car."

### E. Father's Testimony

Father testified that he had a loving relationship with his two children, Keith and Kate, and visited them often while the case was pending. He acknowledged signing an affidavit of relinquishment on the day of trial, and that nobody forced him to do so, but stated that it was in the children's best interest that Grandmother adopt them as she intended and as he wished. Father also expressed his desire to maintain contact with his children.

**F. Grandmother's Testimony**

Grandmother testified that Keith and Kate lived with her at the time of trial. Grandmother testified that, although it was a "struggle at first[,]" things were going well. She stated that she intended to adopt the children and was working with the Department to achieve that goal.

**G. Allison Conner's Testimony**

Allison Conner ("Conner") testified that she is the supervisor in this case, and Ryan Krone is Kyle's Casa advocate. Conner met with Kyle and had no concerns about his foster home. She believes that it is in Kyle's best interest to remain with his foster family and for them to adopt him.

**H. Documentary Evidence**

The trial court admitted the following exhibits offered by the Department:

**Exhibit 1**: Family Plan of Service, filed May 3, 2023

This service plan requires Mother and Father to complete a parenting class. It also requires Mother to participate in a domestic violence assessment and a psychological evaluation, attend a drug and alcohol assessment, and submit to random drug screens.

The service plan requires Father to obtain and maintain stable employment to provide for his family, as well as a stable home environment that is "safe and appropriate for the children." Like Mother, Father was required to participate in a

11

psychological evaluation, attend an alcohol and drug assessment, and submit to random drug testing. The service plan also required Father to successfully complete a Department approved Batter's [sic] Intervention & Prevention Program. It does not indicate that either Mother or Father "require[d] additional supportive services or assistance in order to accomplish the tasks in the Family Plan of Service[.]" Neither parent signed the service plan since Father was incarcerated at the time of the conference, and Mother refused to participate in the conference.

**Exhibit 2**: Agreed Order in Suit Affecting the Parent-Child Relationship (Kyle)

This Order, filed January 9, 2018, applies to a Suit Affecting the Parent-Child Relationship among Mother, Kyle, and Kyle's father. It sets forth the amount of child support to be paid, periods of possession, and the like.

**Exhibit 3**: Father's Acknowledgments of Paternity (Keith and Kate)

In these documents, filed February 6, 2024, Father acknowledged his paternity of Keith and Kate, the two younger children.

**Exhibit 4**: Father's Affidavit of Voluntary Relinquishment (Keith and Kate)

Father signed this affidavit on August 21, 2024, the day of trial. The affidavit reflects that Keith and Kate are Father's children, and it shows their dates of birth. It also lists the specific rights Father would relinquish by signing the affidavit and designates the Department as managing conservator and consents to the children's

12

adoptive placement, stating "I freely, voluntarily, and permanently give and relinquish to the Department all my parental rights and duties. I consent to the placement of the children for adoption or in substitute care by the Department or by a licensed child-placing agency." It further sets out that it is "final, permanent, and irrevocable[,]" and states "I fully understand that, if I change my mind at any time, I can never force the agency to destroy, revoke or return this affidavit." It continues as follows:

> I fully understand that this affidavit, once signed, is irrevocable, and I will not be further informed of any hearings or proceedings affecting the child named in this affidavit, including any termination suit.

> I have received a copy of this Affidavit of Relinquishment at the time of signing.

> I am signing this Affidavit, because I love my children, [Keith] and [Kate] and I believe that at this time, [] it is in the best interest of the children that they be raised by my mother, [Grandmother].

> It is my desire that [Grandmother] be granted sole managing conservatorship of my children, [KEITH] and [KATE].

> The affidavit was signed by Father, by two witnesses, and was notarized.

**Exhibit 9**: Mother's Judgment of Conviction (driving while intoxicated)

In June 2018, Mother was convicted of her second offense of driving while intoxicated. She was sentenced to thirty days in the Montgomery County jail.

**Exhibit 10**: Complaint in Mother's Driving While Intoxicated Case

Complaint filed in above case.

13

**Exhibit 11**: Mother's Indictment (possession of methamphetamine)

In June 2018, Mother was charged with possession of less than one gram of methamphetamine.

**Exhibit 12**: Mother's Judgment of Conviction (possession of methamphetamine)

Mother was convicted of methamphetamine possession and sentenced to thirty days in the Montgomery County jail, with her sentence to run concurrently with her sentence for driving while intoxicated.

**Exhibit 14**: Death Certificate (Kyle's biological father)

Kyle's biological father died at his home in May 2019. The certificate lists Mother as the surviving spouse.

**Exhibit 15**: Status Hearing Order

This January 30, 2024 Order reflects, among other things, that neither Mother nor Father had signed the service plan and sets out that Mother and Father would need to complete services and "demonstrate the ability to provide a safe and stable home and environment for the children[]" to reduce their level of supervision.

**Exhibit 16**: Notice of Filing (Keith and Kate)

These Notices state that neither Keith nor Kate were "the subject of a suit affecting the parent-child relationship in which a judgment was entered on or after January 1, 1974."

Exhibits one through four and fourteen through sixteen were admitted without objection. The trial court admitted Exhibits nine through twelve over a relevancy objection from Mother's attorney.

## III. STANDARD OF REVIEW

Termination of parental rights requires proof by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Clear and convincing evidence is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. Due to the elevated burden of proof in parental termination cases, the traditional legal and factual sufficiency standards are inadequate. *See In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). In reviewing the legal sufficiency in a parental rights termination case, the reviewing court "should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* at 266. We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *See id.* However, we are not required to disregard all evidence that does not support the finding. *See id.* If we find that no reasonable

factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *See id.*

In reviewing the factual sufficiency in a parental termination case, the reviewing court "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* The question we must answer is "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). In our determination, we should consider whether a reasonable factfinder could resolve the disputed evidence in favor of its finding. *See id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In our review, we must be careful to "provide due deference to the decisions of the factfinder, who, having full opportunity to observe [the] witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citation omitted).

## IV. ANALYSIS

### A. Mother's Appeal

In six points of error, Mother challenges all six of the trial court's findings that were adverse to her. In Mother's first two issues she argues there was legally

16

and factually insufficient evidence that (1) she knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger their physical or emotional well-being, and (2) she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). In her fifth issue, Mother contends that there is "no evidence in the record to support that termination of [her] parental rights is in the best interest of the child[ren]." *See id.* § 161.001(b) (2).

Since we affirm the trial court's Order as to these grounds, we need not consider Mother's remaining points of error as they would not alter the disposition of this case.[4] *See* Tex. R. App. P. 47.1; *see also In re L.W.R.L.*, No. 09-24-00256-CV, 2025 Tex. App. LEXIS 179, at *60 (Tex. App.—Beaumont Jan. 16, 2025, no pet. h.) (mem. op.). We do, however, note that when the parents' rights have been terminated, Family Code section 161.207 governs the appointment of a managing conservator. *See* Tex. Fam. Code Ann. § 161.207; *In re N.T.*, 474 S.W.3d 465, 479-80 (Tex. App.—Dallas, 2015, no pet.). Section 161.207(a) provides, "[i]f the court terminates the parent-child relationship with respect to both parents or to the only

---

[4] Mother's third, fourth, and sixth points of error argue that the trial court erred in terminating her rights under subsections N and O, and that the trial court further erred in appointing the Department as the children's permanent managing conservator, respectively. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(N), (O); 161.207(a).

living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). We cannot conclude that the trial court abused its discretion by appointing the Department as the children's managing conservator. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re N.T.*, 474 S.W.3d at 479-80.

Points One and Two: Condition and Conduct Endangerment

Since findings of condition endangerment under subsection D and conduct endangerment under subsection E may be based on the same acts or omissions, we consider them together. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). *See In re B.P.*, No. 09-22-00031-CV, 2022 Tex. App. LEXIS 4277, at **23-24 (Tex. App.—Beaumont June 23, 2022, no pet.) (mem. op.).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *See In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Termination under subsection E requires more than a single act or omission and a "'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). As for subsection D, we examine the time before the child's removal to

18

determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *Id.* at 925 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "'A finding of endangerment under subsection E, however, may be based on conduct both before and after removal.'" *In re A.S.*, No. 09-24-00116-CV, 2024 Tex. App. LEXIS 6892, at *33 (Tex. App.—Beaumont Sept. 19, 2024, pet. denied) (mem. op.) (quoting *In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied)). "[E]ndangerment encompasses . . . conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

Under subsection E, it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. *See Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.). "A child is endangered when a parent is aware but consciously disregards that an environment creates the potential for danger." *In re C.M.C.*, 554 S.W.3d 164, 171 (Tex. App.—Beaumont 2018, no pet.). Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Abusive or violent conduct by a parent may produce a home environment that endangers a child's well-being. *See In re M.S.*, 662 S.W.3d 620, 630 (Tex. App.—Beaumont 2023, pet. denied) (citing *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied)). "'Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the child's presence, were not directed at the child, or did not cause actual injury to the child.'" *Id.* (quoting *In re K.A.R.*, No. 04-17-00723-CV, 2018 Tex. App. LEXIS 2548, at *9 (Tex. App.—San Antonio Apr. 11, 2018, pet. denied) (mem. op.)). "A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021).

A parent's drug use, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.); *see also In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective*

*Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). Endangerment does not require a parent's drug use or other acts or omissions to directly harm the child. *See In re R.R.A.*, 687 S.W.3d at 278 (drug use); *In re B.P.*, 2022 Tex. App. LEXIS 4277, at *27 (untreated mental illness can expose a child to endangerment).

Mother's criminal history included a conviction for possession of methamphetamine in 2018. Although we have no direct evidence that Mother was using illicit drugs, she refused to take any drug test required by her plan of service and "the trial court may infer from a parent's refusal to submit to drug testing that they are using drugs." *In re M.S.*, 662 S.W.3d at 629. Since "evidence of a parent's drug use can support the conclusion that the child[ren]'s surroundings endanger [their] physical or emotional well-being under subsection D and qualify as a 'voluntary, deliberate, and conscious course of conduct endangering the child[ren]'s well-being under subsection E[,]'" the inference of Mother's drug use supports termination under both subsections D and E. *In re B.P.*, 2022 Tex. App. LEXIS 4277, at *25 (citation omitted).

Laying aside the question of whether Mother was using illegal drugs while in possession of the children, her untreated mental illness supports the trial court's

21

decision to terminate her parental rights since "untreated mental illness can expose a child to endangerment and is a factor the court may consider." *Id.* at *27 (citation omitted). Here, as in *In re B.P.*, Mother did not take her prescribed medication. *See id.* The trial court, consequently, "could have concluded [that] Mother's failure to comply with mental health treatment exposed her children to endangerment." *Id.* The evidence showed that Mother screamed at the walls due to her hallucinations yet failed to obtain and take replacement medication after Father disposed of her prescribed medication. This evidence is relevant to Mother's parenting ability and shows how her conduct, and the living conditions it created, affected the children's well-being. *See In re M.S.*, 662 S.W.3d at 629 (noting that parental conduct may create an endangering environment). Kyle's description of his home life, wherein he told Holder that he did not feel safe at home and that Mother continued talking to walls, although he told her that the voices are not real, illustrates how Mother's conduct created an environment that endangered the children's physical or emotional well-being by subjecting them to her erratic behavior. *See id.*

In addition, the removal affidavit reflects that Father told a third party that Mother was physically violent toward him. Even though this conduct apparently was not directed at the children, "'[d]omestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the child[ren]'s presence, were not directed at the child[ren], or did not cause

22

actual injury to the child[ren].'" *Id.* at 630 (quoting *In re K.A.R.*, 2018 Tex. App. LEXIS 2548, at \*9). Here, as in *In re M.S.*, the trial court heard evidence that Mother exhibited unstable behavior, had untreated mental health issues, had been violent toward Father, and failed to submit to drug tests, thus implying that she was using illegal drugs. *See id.* Viewed either separately or together, the evidence of Mother's mental health, domestic violence, and drug use would enable the trial court to form a firm belief or conviction that Mother knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

We overrule Mother's first and second points.

Point Five: The Children's Best Interest

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the best interest of a child is served by keeping the child with his parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann. § 153.131(b). Prompt and permanent placement of a child in a safe environment is also presumed to be in a child's best interest. Tex. Fam. Code Ann. § 263.307(a). When determining the best interest of the child, a court may consider circumstantial

23

and direct evidence, subjective factors, and the totality of the evidence, and evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d at 28; *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child including, among others: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family and friends is available to the child. Tex. Fam. Code Ann. § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116.

The Texas Supreme Court has articulated several additional factors that courts may consider when determining whether termination of parental rights is in the best interest of the child, including: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No specific *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

In a best-interest analysis, the focus is on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

The Department need not present evidence to support each of the *Holley* factors, as the lack of evidence on some factors will not preclude the factfinder from forming a strong conviction that terminating the parent-child relationship is in the child's best interest, particularly when the evidence is undisputed that the parent endangered the child. *In re C.H.*, 89 S.W.3d at 27. As the reviewing court, the question we must decide is whether the record, when considered as a whole, supports the trial court's best-interest finding. *Id.* at 28.

As mentioned above, the trial court considered evidence of Mother's conduct and the children's living conditions and found conduct and condition endangerment based on this evidence. The trial court also heard that the children were doing well in their then-current placements.

Deferring to the trial court's role as the sole arbiter of the facts, we conclude the record contains legally and factually sufficient evidence to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(b); *see also In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. We overrule Mother's fifth point challenging the sufficiency of the evidence

supporting the trial court's determination that termination of her parental rights was in the children's best interest.

## B. Father's Appeal

### Preservation of Error

Out of an abundance of caution, we discuss the merits of Father's appellate arguments concerning the relinquishment affidavit below, even though we hold that Father failed to preserve error as to his complaints that the relinquishment affidavit was defective. *See* Tex. R. App. P. 33.1(a)(1)(A); *In re A.S.*, 2024 Tex. App. LEXIS 6892, at *39 (citations omitted) ("The rules governing error preservation apply to civil cases involving termination of parental rights.").

To preserve a complaint for appellate review, the complaining party must make a "timely request, objection, or motion" to the trial court that "state[s] the grounds . . . with sufficient specificity to make the trial court aware of the complaint[.]" Tex. R. App. P. 33.1(a)(1)(A); *In re A.S.*, 2024 Tex. App. LEXIS 6892, at *39. The party must also obtain the trial court's ruling on the objection. Tex. R. App. P. 33.1(a)(2)(A); *In re A.S.*, 2024 Tex. App. LEXIS 6892, at *39. Father did not apprise the trial court of the alleged shortcomings in his affidavit of relinquishment or the court's Order of Termination based on that affidavit; "[a]ccordingly, those complaints are not preserved for appellate review." *See In re A.S.*, 2024 Tex. App. LEXIS 6892, at *40.

Point One: Validity of Affidavit

While we believe the error was not properly preserved, we nonetheless address Father's first appellate point, in which he contends that the affidavit he signed, relinquishing his parental rights to Keith and Kate, was invalid for failure to comply with all statutory requirements. In particular, Father observes that his affidavit does not reflect either his age or Keith's and Kate's ages, as dictated by the Family Code. *See* Tex. Fam Code Ann. § 161.103(b)(1), (2) (setting out the required content of an affidavit of relinquishment). Father also complains that the affidavit does not contain Mother's county of residence. *See id.* § 161.103(b)(7)(A). Although, as Father correctly notes, his affidavit of relinquishment does not show his age, the ages of his children, or Mother's county of residence, these omissions do not render his affidavit void. *See In re K.S.L.*, 538 S.W.3d 107, 110 (Tex. 2017) (listing some of the requirements of a valid affidavit of relinquishment); *see also In re A.H.*, 2014 Tex. App. LEXIS 13549, at *10 (Tex. App.—Beaumont Dec. 18, 2014, no pet.) (mem. op.) (addressing a similar argument).

In *In re A.H.*, as here, the parent contended that the affidavit of relinquishment was invalid because it lacked information reflecting ages and county of residence. *See In re A.H.*, 2014 Tex. App. LEXIS 13549, at *10. We rejected that argument, noting that "[e]vidence that an affidavit of voluntary relinquishment was signed, notarized, witnessed, and executed in compliance with section 161.103 of the Family

Code is prima facie evidence of its validity." *Id.* (citation omitted). Since Father's affidavit was "signed, notarized, witnessed, and executed in compliance with section 161.103 of the Family Code[,]" and since Father has not shown otherwise, his affidavit is presumptively valid. *See id.*

In that opinion, we further observed that "challenges to deficiencies in the affidavits are precluded under section 161.211(c)." *Id.* Section 161.211(c), which we discuss in greater detail below, limits attacks on affidavits of relinquishment to "issues relating to fraud, duress, or coercion[.]" Tex. Fam. Code Ann. § 161.211(c). We accordingly apply the rationale of *In re A.H.* to the case now before us and hold that Father's affidavit relinquishing his parental rights to Keith and Kate was valid. We further observe that an affidavit of relinquishment that designates the Department or a licensed child-placing agency as the managing conservator, as does Father's affidavit, is irrevocable by statute. *See* Tex. Fam. Code Ann. § 161.103(e); *see also In re A.H.*, 2014 Tex. App. LEXIS 13549, at **13-14 (incorporating the irrevocability language of the Family Code).

We overrule Father's initial point on appeal.

Point Two: Alleged Fraud

In his second point, Father argues that the trial court's Order terminating his parental rights to Keith and Kate could not be based on his affidavit because the affidavit "was obtained as a result of fraud." More specifically, Father contends that

29

the Department knowingly made a false, material, representation to him that Keith and Kate would stay with Grandmother to induce him to sign the affidavit, and that he relied on it and sustained harm as a result.

The Texas Family Code states "[a] direct or collateral attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights . . . is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit." Tex. Fam. Code Ann. § 161.211(c). As Father does not contend that he executed the affidavit under duress or that he was coerced into signing it, we will examine the circumstances of executing the affidavit in light of the definition of fraud to resolve this issue.

Section 161.211 does not define "fraud," so we use the word's ordinary meaning: "a false, material representation that is made knowingly or recklessly, with intent to induce reliance, and that induces reliance." *In re Reedle*, No. 05-16-01483-CV, 2017 Tex. App. LEXIS 2091, at *5 (Tex. App.—Dallas Mar. 10, 2017, orig. proceeding) (mem. op.) (citation omitted). The falsity of the representation must be known to the speaker at the time the representation is made. *See In re K.D.*, 471 S.W.3d 147, 157 (Tex. App.—Texarkana 2015, no pet.).

Father claims the Department induced him to sign the affidavit of relinquishment by telling him "that the children would remain with his mother[,]" and that the "condition [that the children would remain with Grandmother] was

30

specifically included in the Affidavit of Relinquishment of Parental Rights signed by [Father]." The record, however, does not support Father's argument that the Department fraudulently induced him to sign the affidavit. Not only is there no evidence in the record that the Department knowingly or recklessly misrepresented that the children would remain with Grandmother, but also the record reflects that the children were doing well in Grandmother's care and that the Department's witnesses, including the children's CASA advocate, believed it was in the children's best interest to remain there. The fact that Grandmother has not adopted Keith and Kate as previously planned does not mean that the Department fraudulently induced Father to sign the affidavit of relinquishment. *See id.* at 157-61 (discussing the requirement that the speaker realize the inaccuracy of the statement).

In *In re K.D.*, the Department's representatives made various inaccurate statements about how the child was progressing in her placement. *See id.* at 153-56. When the mother sought to invalidate her affidavit of relinquishment on the ground that these statements were incorrect, and therefore allegedly fraudulent, our sister court affirmed the validity of the affidavit, stating that "the Department did not fraudulently induce Mother to enter into the Affidavit[]" because "there was no evidence the Department (1) knew that any statements made . . . were false or (2) recklessly made any statement without knowledge of its veracity." *Id*. at 159-60. As in *In re K.D.*, there is no evidence that the Department knew that the children would

31

not remain with Grandmother when Father signed the affidavit or that the Department recklessly made any statement without knowledge of its veracity. *See id.* Accordingly, we conclude there was no fraud underlying Father's decision to relinquish his parental rights to his children.

We overrule Father's second point.

Point Three: The Children's Best Interest

In his third and final point, Father posits that terminating his parental rights was not in Keith's or Kate's best interest. Father makes this argument on the ground that the best interest finding was predicated solely on his affidavit, which was not only invalid for lack of strict statutory compliance, but for having been procured through the Department's alleged fraud. Having determined that the affidavit of relinquishment was not invalid for either of Father's proffered reasons, Father's best interest challenge fails. Since Father's affidavit of relinquishment is valid and a best interest finding may be based on an affidavit of relinquishment, the trial court could reasonably conclude that terminating Father's parental rights to Keith and Kate was in the children's best interest. *See In re K.S.L.*, 538 S.W.3d at 111 ("We believe that the affidavit itself, in the ordinary case, can be ample evidence to support a best-interest determination."). We conclude the Department established, by clear and convincing evidence that termination of Father's parental rights is in the children's

best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We overrule Father's final appellate point.

## V. CONCLUSION

We conclude that the Department established, by clear and convincing evidence, that Mother committed the predicate acts enumerated in sections 161.001 (b)(1)(D), (E), and that Father committed the predicate acts enumerated in section 161.001(K). *See* Tex. Fam. Code Ann. § 161.001((b)(1)(D), (E), (K). We also conclude the Department established, by clear and convincing evidence that termination of Mother's and Father's parental rights is in the children's best interest. *See id.* § 161.001(b)(2). Having overruled each of Mother's and Father's points, we affirm the trial court's order terminating Mother's and Father's parental rights to Kyle, Keith, and Kate.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on December 27, 2024
Opinion Delivered February 13, 2025

Before Johnson, Wright and Chambers, JJ.

33